STATE OF NORTH CAROLINA v. BILLY LEE BLACKSTOCK

No. COA03-732

(Filed 6 July 2004)

**1. Search and Seizure— investigatory stop—motion to suppress**

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by denying defendant's motion to suppress evidence seized by law enforcement officers during the 17 April 2000 investigative stop of an automobile in which defendant was a passenger, because: (1) defendant's arguments point to nothing more than inconsistencies and discrepancies in the evidence, the resolution of which was for the trial court; and (2) while a single one of the factors relied upon by law enforcement officers and cited by the trial court might not in itself have been sufficient to sustain a reasonable suspicion that criminal conduct was underway, the composite of the factors as detailed in the trial court's findings of fact adequately sustained a reasonable and articulable suspicion that criminal activity was afoot.

**STATE v. BLACKSTOCK**

[165 N.C. App. 50 (2004)]

**2. Evidence— hearsay—nontestimonial statements—right of confrontation**

Hearsay statements made by a murder victim to his wife and daughter concerning the shooting of the victim during a robbery were nontestimonial and not rendered inadmissible by *Crawford v. Washington*, 541 U.S. —— (2004) where they were made during personal conversations that took place over a period of several days after the shooting at a time when the victim's physical condition was improving and he could have expected to personally testify at the trial.

**3. Evidence— hearsay—state of mind exception—residual hearsay exception**

The trial court erred in a first-degree murder and robbery with a dangerous weapon case by admitting hearsay statements made by the victim to his wife and daughter concerning the robbery and shooting, because: (1) the statements were made several days after the robbery and therefore were not admissible under N.C.G.S. § 8C-1, Rule 803(3) to show the victim's then-existing state of mind during the robbery; (2) the statements made by the victim to his wife and daughter did not bear particular guarantees of trustworthiness required for admissibility under the residual hearsay exception for testimony by unavailable witnesses set forth in N.C.G.S. 8C-1, Rule 804(b)(5) since, although the victim may have had no motivation to speak untruthfully to either the police captain or his wife and daughter, his statement to the officer that he was shot during a struggle for the gun versus the statement to his relatives that he was shot while on his knees with his hands in the air pleading for his life cannot be reconciled without the benefit of cross-examination, which defendant was denied; and (3) the improperly admitted hearsay statements contained the only evidence of premeditation and deliberation, and thus, the jury's verdict of first-degree murder cannot stand on that basis but can still rest on the felony murder theory with vacation of the armed robbery conviction which serves as the basis for the felony murder.

Appeal by defendant from judgments entered 25 February 2002 by Judge Michael E. Helms in Superior Court, Rockingham County. Heard in the Court of Appeals 18 May 2004.

**STATE v. BLACKSTOCK**

[165 N.C. App. 50 (2004)]

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for defendant appellant.*

WYNN, Judge.

Defendant Billy Lee Blackstock appeals from judgments of the trial court entered upon jury verdicts finding him guilty of robbery with a dangerous weapon and first-degree murder on the basis of premeditation and deliberation and felony murder. Defendant argues such judgments must be reversed, in that the trial court erred by (I) denying his motion to suppress; (II) admitting hearsay statements; (III) overruling his objections to statements made by the prosecutor during closing argument; and (IV) allowing an expert witness to state that the bullet wound suffered by the victim was the proximate cause of death. We conclude the trial court erred in admitting the hearsay statements in violation of Defendant's right to confrontation. Because the hearsay statements pertained only to Defendant's conviction of first-degree murder under a theory of premeditation and deliberation, however, we find no error in Defendant's conviction of felony murder; and, following our case law, we vacate Defendant's conviction of robbery with a dangerous weapon. *State v. Millsaps*, 356 N.C. 556, 560, 572 S.E.2d 767, 770 (2002).

At the trial, the State presented evidence tending to show that on the evening of 15 April 2000, Cecil Weeks was working at the convenience store he owned and operated in Reidsville, North Carolina. Weeks was alone in the store. Two African-American men wearing masks and carrying handguns entered the store at approximately 9:30 p.m. and demanded money. Weeks was shot in the upper right chest during the course of the robbery.

Weeks was treated for the gunshot wound at a hospital, where his condition improved over the next four days. On the fifth day, he developed an infection in his blood stream and died on 22 April 2000. Before his death, Weeks made several statements to law enforcement officers and his wife and daughter describing the robbery and the shooting. The trial court allowed Weeks' wife and daughter to testify to these statements at trial over Defendant's objections.

Investigating officers recovered a spent .40 caliber bullet and shell casing from the floor of the convenience store. Testing revealed that the bullet recovered from the scene of the robbery was fired from

a Glock handgun belonging to Defendant and seized by officers during a 17 April 2000 investigative stop of an automobile in which Defendant was a passenger. During a subsequent search of Defendant's residence, officers discovered a pair of blood-stained jeans identified by Defendant as belonging to him. A forensic molecular geneticist performed a DNA analysis and concluded that the blood stain on the jeans matched Weeks' DNA profile. Finally, a witness for the State identified Defendant as one of two men she observed loitering behind the convenience store approximately thirty minutes before the robbery.

Before trial, counsel for Defendant moved to suppress evidence seized by law enforcement officers during the 17 April 2000 investigative stop. At the suppression hearing, Greensboro police officer J.D. Slone testified that, on 16 April 2000, he was working with fellow officer Jay Tunstall as part of a larger unit of officers known as the "Crime Abatement Team." The officers wore plain clothes and patrolled in an unmarked vehicle "the area between Summit Avenue and Bessemer and back to Cone Boulevard" in northeast Greensboro because "the statistical data indicated this area had a problem with robberies and break-in and enterings." At approximately 11:45 p.m., Officer Slone "observed two black males dressed in dark clothing . . . walking along the front of the closed businesses of [a] strip mall." None of the businesses in the strip mall was open, the lighting was dim, and there were no vehicles in the parking lot. The two men "were walking very slowly, and they were looking into the business windows and looking back throughout the parking lot and back into the businesses as they were going up along the sidewalk." Officer Slone relayed his observations to his sergeant, who arrived at the scene in a vehicle with visible police antennas and a mounted blue light on the rear window. One of the two men turned and appeared to spot the police vehicle, whereupon both men "immediately turned around and stopped their direction of travel that they were going and immediately began to walk hurriedly back toward . . . the western end of the building." The men entered a vehicle parked at the end of the building, in an area generally concealed from public view. The officers followed the two men, who drove slowly through the parking lots of a gas station and a fast-food restaurant, but did not stop. The man sitting in the passenger's seat turned his head and "looked over his left shoulder, and he kept his head turned back for a few seconds as if he was trying to identify the vehicle." At that point, Officers Slone and Tunstall decided they would stop the vehicle. Officer Slone testified the decision to stop the vehicle was

[b]ased upon the statistical data we reviewed and the indication of robberies in that area, given the time of night it was, the dark clothing they were wearing, the position of their car out of sight, the way they moved along the front of the businesses, moving around. They were trying to be aware of their surroundings when they began to walk around the parking lot and when they observed the police vehicle, they turned and changed their pace. They got into their vehicle and left.

They pulled directly into the [gas station parking] lot as if they were casing the business, what appeared to be—it was a slow pace. Never did stop. Pulled back onto the street; upon approaching the [fast food restaurant], immediately we were behind them because they failed to give a turn signal in an orderly fashion. The front seat passenger immediately looked over as if they were trying to identify the people within the vehicle.

. . . .

And the fact that they drove through the [fast food restaurant parking] lot and upon getting on Sullivan Street, we were behind them. Again, they started looking, again, as if they were trying to identify who it was.

The officers stopped the vehicle near the campus of A&T University. The driver identified himself as Tory Gerald Tucker, but told Officer Slone he did not have his driver's license with him. Officer Slone identified Defendant as the passenger. Officer Slone requested that Tucker step out of the vehicle. Tucker informed Officer Slone they were traveling to A&T University "to talk with a football player by the name of Marvin Blackstock." Officers with A&T University informed Officer Slone that no such person was listed in the university roster. Tucker further explained that the two men had been at the strip mall earlier to use a pay phone; however, Officer Slone stated there were no pay phones in the immediate area of the shopping center. Tucker gave Officer Slone permission to search his vehicle. Officers found a plastic bag containing two ounces of marijuana and a "loaded Glock 23 .40 caliber handgun" beneath the front passenger seat. Both Tucker and Defendant denied ownership of the weapon. The officers also found two black toboggans and "a female-styled hair wig" in the vehicle.

Defendant presented the testimony of Doris Hunter, the registrar at A&T University, who verified that a student named Marvin

Blackstock was enrolled and attended the university during April of 2000. Hunter further testified that Blackstock was a football player for the university.

The trial court denied Defendant's motion to suppress, and the case came to trial on 7 January 2002. Upon conclusion of the evidence, the jury found Defendant guilty of armed robbery and first-degree murder under the felony murder rule and on the basis of premeditation and deliberation. Upon the jury's recommendation that Defendant be spared the death penalty, the trial court sentenced Defendant to life imprisonment without parole for the first-degree murder conviction and a term of sixty-four to eighty-six months' imprisonment for the armed robbery conviction. Defendant appealed.

Defendant presents four assignments of error on appeal, arguing the trial court erred by (I) denying his motion to suppress evidence seized by law enforcement officers during the 17 April 2000 investigative stop; (II) admitting statements made by Weeks to his wife and daughter; (III) overruling his objections to statements made by the prosecutor during closing argument; and (IV) allowing an expert witness to state that the bullet wound suffered by Weeks was the proximate cause of death. For the reasons stated herein, we conclude the trial court erred in admitting the hearsay statements made by Weeks to his wife and daughter.

## I. *Motion to Suppress*

[1] By his first assignment of error, Defendant contends the trial court erred in denying his motion to suppress evidence seized during the 17 April 2000 stop of the automobile in which Defendant was a passenger. Defendant contends that some of the findings by the trial court are not supported by the evidence, and that, in turn, the trial court's conclusion that the investigative detention was lawful is erroneous.

We review a trial court's ruling on a motion to suppress to determine whether the findings of fact are supported by competent evidence, and whether the findings support the conclusions of law. *State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996) (noting that a trial court's resolution of a conflict in the evidence will not be disturbed on appeal). The trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. *Id.* Once we conclude that the trial court's findings of fact are supported by the evidence, our next task "is to determine whether

the trial court's conclusion[s] of law [are] supported by the findings." *State v. Hyde*, 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). "Conclusions of law that are correct in light of the findings are also binding on appeal." *State v. Howell*, 343 N.C. 229, 239, 470 S.E.2d 38, 43 (1996). "This deference is afforded the trial judge because he is in the best position to weigh the evidence, given that he has heard all of the testimony and observed the demeanor of the witnesses." *State v. Hughes*, 353 N.C. 200, 207, 539 S.E.2d 625, 631 (2000).

In the instant case, law enforcement officers seized evidence pursuant to an investigative stop of a vehicle in which Defendant was a passenger. Unreasonable searches and seizures are prohibited by the Fourth Amendment to the Constitution of the United States and Section 20 of Article I of the North Carolina Constitution. *State v. Garner*, 331 N.C. 491, 506-07, 417 S.E.2d 502, 510 (1992), *cert. denied*, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996). They apply to "seizures of the person, including brief investigatory detentions such as those involved in the stopping of a vehicle." *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69-70 (1994). "An investigatory stop must be justified by 'a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.' " *Id.* at 441, 446 S.E.2d at 70 (quoting *Brown v. Texas*, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 362 (1979)). In ascertaining whether an officer had a reasonable suspicion to make an investigatory stop, the court must consider the totality of the circumstances. *Id.* "The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." *Id.* Our Supreme Court has acknowledged that activity at an unusual hour is a factor that may be considered by a law enforcement officer in formulating a reasonable suspicion. *Id.* at 442, 446 S.E.2d at 70.

In reviewing the evidence submitted by the State, the trial court found, *inter alia*, that

> Among the facts composing the totality of the circumstances (the whole picture) supporting a reasonable and articulable suspicion by an experienced law enforcement officer that criminal activity was afoot at the Fairview Shopping Center just before 12 midnight are that (a) every one of the businesses was closed, (b) the shopping center is a block away from the lighted glare of Summit Avenue, (c) the back entrances to the shopping center open onto an asphalt lot and the lot is surrounded by a high fence which can

be accessed from near where the car in which the two were riding was parked, (d) the shopping center parking lot was essentially dark, (e) the light eliminating [sic] from the businesses was dim, (f) the two were wearing dark clothing, (g) it was just before midnight, (h) there were no visible vehicles in the parking lot and no other persons on the sidewalks or parking lot of the shopping center, (i) the strip shopping center was in an area where incidences of crime were on the significant increase, (j) the two slowly walked by the buildings near the windows, looking into the businesses as if casing them and as if looking to see what back door entrances there might be opening onto the asphalt back lot, which lot was essentially hidden from the view of the public, (k) one of the businesses was a type of bank, (l) the two walked into the parking lot and their walking came almost to a stop and they were "hanging out" as if they were looking to break into something, (m) the two seemed to be looking out for something or expecting somebody, (n) the two did not seem to be mere passersby, (o) the observing officers could not tell where the two came from, (p) the two parked their vehicle out of general view, (q) the shopping center would not be generally used for parking by residences in the area, (r) when a vehicle came into their sight, which they could have believed was a law enforcement vehicle, (alternatively that upon approach of a stranger in a Ford Taurus automobile they fled the parking lot) the two looked at each other and turned and hurriedly walked to the dark end of the strip and got in a hidden from view vehicle and left, (s) such flight from a law enforcement vehicle was unprovoked, (t) once on Summit Avenue they tried to lose any law enforcement officers who were following them by turning into the Citgo service station where they did not stop or conduct any business, and (u) turned into Wendys abruptly and looked around and took a sustained look at the vehicle following them, drove around Wendys without stopping or transacting any food business, and probably confirmed that law enforcement officers were following them. The suspicion that criminal activity was afoot at around 12 midnight on the night of April 16-17, 2000 was a reasonable and articulable suspicion. Such suspicion by Officer Slone was not a mere inchoate suspicion or mere hunch.

Defendant objects to several of the trial court's findings of fact, asserting they are unsupported by the greater weight of the evidence. For example, Defendant contends there was insufficient evidence to

support the trial court's findings that (1) the Fairview Shopping Center was in a "high crime area;" (2) the two men appeared to be "casing" the shopping center; and (3) the two men recognized and attempted to evade the officers following them. Defendant's arguments, however, point to nothing more than inconsistencies and discrepancies in the evidence, the resolution of which was for the trial court. See State v. Eason, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994) (conflicting evidence must be resolved by the trial court's findings and such findings will not be disturbed on appeal where supported by competent evidence), cert. denied, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995). After careful consideration of the evidence presented to the trial court, we conclude the trial court's findings of fact are supported by competent evidence. We next consider whether the findings of fact support the trial court's conclusion that the investigative stop was lawful.

When determining whether an officer had reasonable suspicion to conduct an investigative stop, the trial court may properly consider such factors as: (1) activity at an unusual hour; (2) nervousness of an individual; (3) an area's disposition toward criminal activity; and (4) unprovoked flight. State v. Roberts, 142 N.C. App. 424, 429, 542 S.E.2d 703, 707 (2001); State v. Parker, 137 N.C. App. 590, 600-02, 530 S.E.2d 297, 304 (2000). "None of these factors, standing alone, [is] sufficient to justify a finding of reasonable suspicion, but must be considered in context." Roberts, 142 N.C. App. at 429, 542 S.E.2d at 707-08; see also State v. Crenshaw, 144 N.C. App. 574, 577, 551 S.E.2d 147, 150 (2001) (noting that, " 'individually, any of the factors cited in [articulating reasonable suspicion] might not justify a search, but one cannot piecemeal this analysis. One piece of sand may not make a beach, but courts will not be made to look at each grain in isolation and conclude there is no seashore.' ") (quoting Robert G. Lindauer, Jr., State v. Pearson and State v. McClendon: Determining Reasonable, Articulable Suspicion from the Totality of the Circumstances in North Carolina, 78 N.C. L. Rev. 831, 849 (2000)).

We conclude that, while a single one of the factors relied upon by the law enforcement officers and cited by the trial court might not in itself have been sufficient to sustain a reasonable suspicion that criminal conduct was underway, and may well have been consistent with innocent behavior, the composite of the factors as detailed in the trial court's findings of fact adequately sustained a reasonable and articulable suspicion that criminal activity was afoot, and thus supported the trial court's conclusion of law to that effect. Parker, 137 N.C. App.

at 600-01, 530 S.E.2d at 304-05 (holding the trial court properly denied the defendant's motion to suppress where the totality of the circumstances supported a reasonable suspicion that criminal activity was afoot); *State v. Fox*, 58 N.C. App. 692, 695, 294 S.E.2d 410, 412-13 (1982) (holding that reasonable suspicion existed for an investigatory stop of a vehicle the defendant was driving slowly in the early morning hours down a dead-end street where businesses had previously been robbed, where the defendant was dressed shabbily but the vehicle was "real nice," and where the defendant appeared to avoid the officer's gaze in passing) *affirmed per curiam*, 307 N.C. 460, 298 S.E.2d 388 (1983); *State v. Tillett and State v. Smith*, 50 N.C. App. 520, 524, 274 S.E.2d 361, 364 (1981) (holding reasonable and articulable suspicion existed to support the investigatory stop of a vehicle in view of the time of day and the officer's prior knowledge of reports of criminal activity in the area).

Here, Defendant and Tucker were observed loitering at a closed shopping center shortly before midnight wearing dark clothing in an area targeted by law enforcement officers as a high crime area. No other vehicles were in the shopping center parking lot. When a vehicle did appear, which Defendant and Tucker may have recognized as a law enforcement vehicle, the men abruptly and hurriedly returned to their vehicle, which was parked out of general public view, and departed. Once in the vehicle, the passenger turned and looked behind as if trying to determine the identity of the officers following them. These cumulative factors, together with the other detailed findings of fact articulated by the trial court, adequately support the officers' reasonable belief that Defendant and Tucker were involved in criminal activity. We hold the trial court properly denied Defendant's motion to suppress.

## II. *Hearsay Statements*

[2] By further assignment of error, Defendant argues the trial court improperly admitted statements made by Weeks to his wife and daughter concerning the robbery and shooting. Prior to trial, the State filed written motions and notices of its intent to offer into evidence the hearsay statements. Following a hearing regarding the admissibility of the statements, the trial court ruled that the statements were admissible under Rules 803(3) and 804(b)(5) of the North Carolina Rules of Evidence. Defendant contends these statements were not properly admissible under any hearsay exception and that their admission violated his right to confrontation. According to Defendant, these statements were the only evidence to support the

jury's finding of first-degree murder under a theory of premeditation and deliberation. Thus, argues Defendant, admission of the statements irreparably prejudiced him, requiring a new trial.

Linda Billingsley, Weeks' daughter, testified to statements made to her by Weeks in the days following his admission to the hospital. Billingsley stated her father described the robbery as follows:

> He said that he was filling up the drink boxes. He said he heard something up front, and he said that he looked and saw someone come at him with a gun. He said the person was hollering "Don't be stupid or I'll blow your brains out."

> And he said that he fought with this person. He said he had the person down and he had the gun almost away from him, and he said that someone else had came in and stuck a gun to his head and told him not to do anything stupid or he would kill him. That's when he realized it was two and he gave up.

> He said that he was on his knees with his hands raised and he was begging for his life. He was talking about me and my mommy and sister and little girl. He told them not to hurt him, and he said the next thing he knew he was shot.

Weeks' widow, Teresa Weeks, gave similar testimony concerning her husband's statements regarding the robbery:

> He told me he was at the drink box. He was fixing to close up, and he was filling the drink box up. He said he heard the front door open, and he looked up and he saw a black man—well, a man dressed in black, dark clothing with a mask on and gloves; and he said he had a gun and said he came back to him and he told him, "Don't be crazy." He said, "I'll give you the money."

> And he said that—he tried to take the gun away from him. There was just one there. He tried to take the gun away. He said he almost had the gun away from him when another guy came storming through the door. He also was dressed in black with a mask, with dark clothes and he had a gun; and he came back to where he was at and said—he stuck the gun up to his head and he told him, he says, "Don't be crazy or I'll blow your brains out." And he said—he told him, he says, that he had a wife and two children and a grandchild; and he begged him not to kill him.

> He said that he had his hands up. He raised his hands and told them they could have anything they wanted, just don't kill him.

And he said that he got up and—before he got up, he said he heard a gunshot and he didn't realize he was shot until he got up.

Thus, according to Billingsley and Teresa Weeks, Weeks was shot while on his knees with his hands in the air begging for his life. These statements differ significantly from the version of events Weeks gave to law enforcement officers. Captain Guilio Dattero of the Reidsville Police Department interviewed Weeks at the hospital immediately following the robbery and shooting. Weeks told Captain Dattero

> that he was in the process of closing up the store . . . when he went about the business of filling a drink machine in the store. He advised that he was doing that, that he heard the store front door open and two individuals entered. . . . He described the individuals. First of all, Suspect Number 1 as a black male, six feet in height, slender build, black or dark clothing, with a black mask and a black square gun. He then advised me Suspect Number 2 fit the same description, including possible identical ski mask and the weapon description was pretty much the same. . . . He advised that as the two entered the store they approached him, as they both had their weapons drawn. At some point he began to struggle with Suspect Number 1 after the suspects had demanded his cash. The suspect, that is, Suspect Number 1, then fired a single shot at Mr. Weeks, hitting him in the upper chest area.

According to this account of the robbery, Weeks was shot during a struggle for the gun. Thus, the officer's account did not provide evidence supporting the element of premeditation. We must now determine whether the trial court properly admitted the hearsay statements by Billingsley and Teresa Weeks.[1]

The United States Supreme Court's recent opinion in *Crawford v. Washington*, 541 U.S. ——, 158 L. Ed. 2d 177 (2004) established new rules for determining whether the admission of hearsay statements violates a criminal defendant's constitutional right to be confronted with the witnesses against him. Prior to *Crawford*, the admission of an unavailable witness' statement against a criminal defendant was not violative of the Sixth Amendment confrontation right if the witness' statement bore adequate indicia of reliability. *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597 (1980). To meet that test, the out-of-

---

1. We note Defendant did not object at trial to admission of the hearsay statement offered by Captain Dattero, nor does Defendant argue on appeal that admission of the statement was improper. Accordingly, we give no consideration to this issue.

court statement had to fall within a firmly rooted hearsay exception or bear particularized guarantees of trustworthiness. *Crawford*, 541 U.S. at ——, 158 L. Ed. 2d at 186.

*Crawford* replaced this test with a new focus upon the testimonial or nontestimonial nature of the out-of-court statement. *Crawford* held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at ——, 158 L. Ed. 2d at 203. Where nontestimonial hearsay is at issue, however, "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* Thus, under *Crawford*, Sixth Amendment Confrontation Clause analysis will usually turn on the question of whether a particular statement is testimonial or nontestimonial in nature.

In determining whether admission of the hearsay statements in the instant case violated Defendant's Sixth Amendment right to confrontation, *Crawford* requires us to first determine whether the statements were testimonial or nontestimonial. *Crawford* did not explicitly define the term testimonial statements; nonetheless, the Court recognized the following as testimonial in nature: (1) grand jury testimony, (2) prior trial testimony, (3) *ex parte* testimony at a preliminary hearing, and (4) statements taken by police officers in the course of interrogations. *Crawford*, 541 U.S. at ——, 158 L. Ed. 2d at 203. The Court also indicated that some statements covered by the hearsay exceptions are not testimonial in nature, such as business records or statements in furtherance of a conspiracy. *Id.* at ——, 158 L. Ed. 2d at 195-96. Moreover, the Court left open the question of whether the Sixth Amendment incorporates an exception for testimonial dying declarations. *Id.* at —— n.6, 158 L. Ed. 2d at 195 n.6.

We conclude the statements made by Weeks to his wife and daughter were essentially nontestimonial in nature. The evidence tended to show that these were personal conversations that took place over a series of several days, made at a time when Weeks' physical condition was improving. Thus, it is unlikely that Weeks made the statements under a reasonable belief that they would later be used prosecutorially. *See id.* at ——, 158 L. Ed. 2d at 193 (reciting as one example of a definition of testimonial statement "pretrial statements that declarants would reasonably expect to be used prosecutorially"). At the time he made his statements, Weeks could have fully expected to testify at trial himself. Moreover, the fact that Weeks made the statements to his wife and daughter mitigates against the possibility

that he understood he was "bearing witness" against Defendant. *See id.* at ——, 158 L. Ed. 2d at 192 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Because the statements were nontestimonial in nature, *Crawford* does not require their exclusion from trial. We must still determine, however, whether the out-of-court statements were properly admitted under exceptions to the general rule against hearsay.

In its order regarding the admissibility of the hearsay statements, the trial court concluded that the statements by Billingsley and Teresa Weeks were admissible under both Rule 803(3) and Rule 804(b)(5) of the North Carolina Rules of Evidence. We therefore examine the applicability of these two exceptions to the hearsay testimony admitted in this case.

### A. *Rule 803(3)*

[3] Under Rule 803(3), the trial court may properly admit an out-of-court statement as an exception to the rule against hearsay where the statement concerns "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." N.C. Gen. Stat. § 8C-1, Rule 803(3) (2003). Rule 803(3) allows the admission of hearsay testimony if it tends to demonstrate the victim's "then-existing state of mind." *State v. Gary*, 348 N.C. 510, 522, 501 S.E.2d 57, 65 (1998). Such evidence is only admissible if the victim's state of mind is relevant to the issues to be resolved at trial. *State v. Meekins*, 326 N.C. 689, 695, 392 S.E.2d 346, 349 (1990). On appeal, the ruling of the trial court regarding admissibility of evidence will be reversed if the findings are unsupported by competent evidence or if the law was applied erroneously. *State v. Carrigan*, 161 N.C. App. 256, 261, 589 S.E.2d 134, 138 (2003), *disc. review denied*, 358 N.C. 237, 593 S.E.2d 784 (2004).

The State contends the statements at issue were properly admitted under Rule 803(3) to demonstrate Weeks' "existing state of mind and emotional condition" during the robbery. However, the statements by Weeks were made several days *after* the robbery, and therefore do not reflect Weeks' "then-existing" state of mind during the robbery. Rather, the statements were simply a recital of Weeks' memory of the events that took place and his emotional condition at the time. As such, they were not admissible under Rule 803(3). *See* N.C.

Gen. Stat. § 803(3) (excluding statements of memory or belief to prove the fact remembered or believed); *In re Hayden*, 96 N.C. App. 77, 81-82, 384 S.E.2d 558, 561 (1989) (holding that, where the proffered hearsay statement of the victim pertained to a memory of the previous day's events and was offered solely for the purpose of proving such events, such statement was not admissible under Rule 803(3)). The trial court therefore erred in admitting the statements under Rule 803(3). We now determine whether the trial court properly admitted the statements under Rule 804(b)(5).

### B. *Rule 804(b)(5)*

Under Rule 804(b)(5), an out-of-court statement not covered by any of the other exceptions to hearsay may nevertheless be admitted where a declarant is unavailable and the trial court

> determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) (2003). After a trial court establishes that a declarant is unavailable pursuant to Rule 804(a) of the North Carolina Rules of Evidence, the trial court conducts a six-part inquiry to determine the admissibility of the hearsay evidence proffered under Rule 804(b)(5). *State v. Fowler*, 353 N.C. 599, 608-09, 548 S.E.2d 684, 696 (2001), *cert. denied*, 535 U.S. 939, 152 L. Ed. 2d 230 (2002); *State v. Triplett*, 316 N.C. 1, 8-9, 340 S.E.2d 736, 741 (1986). Specifically, the trial court must determine (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission. *Fowler*, 353 N.C. at 609, 548 S.E.2d at 696; *Triplett*, 316 N.C. at 8-10, 340 S.E.2d at 740-41. In addition, the court should consider the "nature and character of the statement and the relationship of the parties." *Triplett*, 316 N.C. at 11, 340 S.E.2d at 742.

Here, there is no question that proper notice was given and that the statements were material to the case against Defendant. We have determined that the statements were not admissible under Rule

803(3), nor do we perceive any other exception under which the statements could be admitted. There seems to be little question, moreover, that the statements were probative. We therefore examine whether the statements were trustworthy, and whether the interests of justice were served by their admission.

In examining the trustworthiness of the statements made by Weeks to his daughter, the trial court found the following facts:

i)   That these statements were made while the deceased was still under the mental and physical stress of the robbery and shooting that occurred on April 15, 2000.

ii)  That these statements were an attempt by the deceased to explain his then existing physical condition, and how he was wounded.

iii) That the statements were motivated by his concern for the safety of the witness, Linda Weeks Billingsley, and described his plan to increase the security of the store.

iv)  That these statements were made to the deceased's daughter. That close, family relationship would have motivated the deceased to speak truthfully and candidly.

v)   That the deceased did not recant his statements.

vi)  The statements were consistent with other statements made by the deceased immediately after he was shot and during his stay in the hospital.

vii) That the statements did not implicate the Defendant or any other individual, but were merely an attempt to accurately inform Cecil Weeks' family members of the nature and sequence of events which led to his wounding.

The trial court made nearly identical findings regarding the statements made by Weeks to his wife.

Defendant contends, and we agree, that some of the critical findings regarding the trustworthiness of the statements are unsupported by the evidence. For example, we find no support in the record for the trial court's finding that the statements by Weeks "were motivated by his concern for the safety of the witness, Linda Weeks Billingsley, and described his plan to increase the security of the store." Although

some evidence was offered at an earlier *voir dire* hearing regarding Weeks' intent to improve security at the store, no such evidence was actually offered at trial.

Further, the trial court's finding that the hearsay statements offered by Billingsley and Teresa Weeks "were consistent with other statements made by the deceased immediately after he was shot and during his stay in the hospital" is not supported by the evidence at trial. While Weeks' description of the robbery and shooting as testified to by Captain Dattero generally resembled the version of events attested to by Billingsley and Teresa Weeks, the statements differed dramatically on the critical issue of the manner in which Weeks was wounded. According to Dattero, Weeks was shot during a struggle for the gun. Billingsley and Teresa Weeks testified, to the contrary, that Weeks was shot while on his knees with his hands in the air and pleading for his life. Thus, although Weeks may have had no motivation to speak untruthfully to either Captain Dattero or his wife and daughter, his statements cannot be reconciled without the benefit of cross-examination, which Defendant was denied.

" 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *Lilly v. Virginia*, 527 U.S. 116, 123-24, 144 L. Ed. 2d 117, 126 (1999) (quoting *Maryland v. Craig*, 497 U.S. 836, 845, 111 L. Ed. 2d 666 (1990)). Where the government seeks to offer an unavailable declarant's out-of-court statements against the accused, courts must determine whether the Confrontation Clause permits the government to deny the accused the well-established right to force the declarant " 'to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth.' " *Id.* (quoting *California v. Green*, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497 (1970)). Under the general framework set forth by the United States Supreme Court in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980),[2] "the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly*, 527

---

2. Although *Crawford* overrules the *Roberts* framework to the extent that it applies to testimonial statements, *Roberts* remains good law regarding nontestimonial statements. *See Crawford*, 541 U.S. at ——, 158 L. Ed. 2d at 203.

U.S. at 124-25, 144 L. Ed. 2d at 127 (quoting *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608).

In the instant case, the first statement given by Weeks to Captain Dattero was admitted under the "firmly rooted" exception of excited utterance. The trial court also admitted the second set of statements made by Weeks to his wife and daughter because it found the statements contained "particularized guarantees of trustworthiness" notwithstanding the fact that the statements fundamentally contradicted the statement testified to by Captain Dattero. Thus, both set of statements were admitted as reliable, even though the statements gave contradicting accounts of the incident. As such, we cannot agree with the trial court that the statements made by Weeks to his wife and daughter bore "particular guarantees of trustworthiness." In contrast to the *Lilly* and *Roberts* standard of "particularized guarantees of trustworthiness" being met "where adversarial testing would be expected to add little, if anything, to the statements' reliability," adversarial testing of the statements in the instant case was critical to reconciliation of the contradictions contained therein and necessary for full discovery of the truth. We conclude the trial court erred in admitting the statements under the residual hearsay exception. We must now determine whether such error was prejudicial.

Defendant argues that the improper admission of the hearsay statements requires a new trial, in that the statements by Billingsley and Teresa Weeks contained the only evidence of premeditation and deliberation on Defendant's part. The jury also found Defendant guilty of first-degree murder on the basis of felony murder, however. Premeditation and deliberation and felony murder are theories under which a defendant may be convicted of first-degree murder. "However, a defendant is convicted of the crime, not of the theory." *Millsaps*, 356 N.C. at 560, 572 S.E.2d at 770. Where a defendant is convicted of felony murder only, the underlying felony constitutes an element of first-degree murder and merges into the murder conviction. *Id.* Consequently, if a defendant is found guilty of first-degree felony murder and the underlying felony, the defendant cannot be sentenced separately for that felony. *Id.; State v. Wilson*, 345 N.C. 119, 122, 478 S.E.2d 507, 510 (1996).

Here, we agree with Defendant that the improperly admitted hearsay statements contained the only evidence of premeditation and deliberation. Thus, the jury's verdict of first-degree murder on that basis cannot stand. However, Defendant's conviction of first-degree murder on the theory of felony murder is without error, and is left

undisturbed. Because we are sustaining Defendant's conviction of first-degree murder only on a felony-murder theory, with armed robbery as the underlying felony, the armed robbery conviction merges with the murder conviction, and Defendant may not be separately sentenced for armed robbery. *Millsaps*, 356 N.C. at 560, 572 S.E.2d at 770. We must therefore vacate Defendant's conviction of armed robbery. We have reviewed Defendant's two remaining assignments of error and find them to be without merit.

We find no error in Defendant's felony murder conviction, but the armed robbery conviction, which serves as the basis for the felony murder, must be vacated. In the judgment of the trial court for first-degree murder, 00 CRS 005674, we find,

No error.

The judgment of the trial court for robbery with a dangerous weapon, 00 CRS 009485, is

Vacated.

Judges CALABRIA and STEELMAN concur.