STATE OF NORTH CAROLINA v. EDGAR BEDOLLA GARCIA

No. COA08-1312

(Filed 16 June 2009)

**Search and Seizure— investigatory detention—anonymous tip—surveillance—sufficient reasonable suspicion**

The trial court's findings supported its conclusion that officers had sufficient reasonable suspicion to stop defendant and place him in investigatory detention where anonymous tips were received about marijuana being stored and sold from a particular house by defendant, the tips were corroborated through searching a police information system and days of surveillance ·of the

house, and the arresting officers followed defendant from the house to a location known for drug activity.

Judge JACKSON concurring.

Appeal by Defendant from judgments entered 25 June 2008 by Judge A. Moses Massey in Superior Court, Forsyth County. Heard in the Court of Appeals 21 April 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General J. Allen Jernigan, for the State.*

*David L. Neal, for defendant.*

WYNN, Judge.

"[A] tip that is somewhat lacking in reliability may still provide a basis for reasonable suspicion if it is buttressed by sufficient police corroboration."[1] Defendant Edgar Bedolla Garcia argues that police officers, relying in part on an anonymous informant's tip, lacked reasonable suspicion to put him into investigatory detention. Because the police officers sufficiently corroborated the anonymous informant's tip, we affirm the trial court's denial of Defendant's motions to suppress.

In May 2007, Detective Kimberly Jones of the Winston-Salem Police Department received a tip from an anonymous informant alleging that marijuana was being stored and sold from a house located at 338 Barnes Road. The informant identified Defendant as the person selling the marijuana. Thereafter, Detective Jones attempted a narcotics investigation at the location; but, no one answered when she knocked. Upon searching Defendant's name on the Police Information System ("PISTOL"), Detective Jones found his picture and information that he lived at 338 Barnes Road, and had a lengthy history of police contact, including suspicion of narcotics and firearms offenses.

Detective Jones received a second tip from the same confidential informant on 7 July 2007. Detective Jones stated that the informant generally gave the same information in the 7 July tip that was contained in the earlier tip, including Defendant's general description. She further testified that, as a result of the information gleaned from

---

1. *State v. Hughes*, 353 N.C. 200, 207, 539 S.E.2d 625, 630 (2000) (citing *Florida v. J.L.*, 529 U.S. 266, 270, 146 L. Ed. 2d 254, 260 (2000)).

**STATE v. GARCIA**

[197 N.C. App. 522 (2009)]

the background check and the second tip, she did undercover surveillance on Defendant's residence three times during July.

On 26 July 2007, Detective Jones was doing undercover surveillance at Defendant's residence while three other officers—Detective Williams, Detective McReady, and Sergeant Southern—stood nearby in their unmarked patrol vehicles ready to assist. Detective Jones observed a white Ford Mustang and a black BMW parked in the driveway. She saw two persons she described as Hispanic males—one wore a white T-shirt and yellow plaid shorts, and the other wore a gray T-shirt and blue jeans—leave and return to the residence in the black BMW several times throughout the day. Detective Jones testified that she was not able to "positively identify" either of the Hispanic males as Defendant at that time; however, she "felt pretty sure" one of the men was Defendant.

At some point during her surveillance on 26 July, Detective Jones observed the Hispanic males going toward a storage shed located on the property in front of the residence at 338 Barnes Road. Her line of sight did not permit her to actually see either individual enter the shed. However, she observed both men coming from the area of the storage shed and returning to the black BMW. The man wearing the white T-shirt and yellow plaid shorts carried "a black bag with large handles," which he placed behind the driver's seat. The man in the white T-shirt and yellow plaid shorts got into the driver's seat; the other man got into the passenger seat, and the men began to leave the residence.

Meanwhile, Detective Jones radioed to the officers standing by to continue surveillance on the BMW. She testified that she communicated her observations at 338 Barnes Road by radio as Detectives McReady and Williams and Sergeant Southern continued their surveillance. They followed the BMW to a Winston-Salem community named "Ferrell Court." In his testimony, Detective Williams stated that he knew Ferrell Court as "a drug location" and "predominantly African-American." Moreover, Detective Williams testified that "since [the officers] were watching [the Hispanic males] for selling marijuana, [the officers] assumed [the Hispanic males] were going down there and probably sell marijuana." Therefore, the officers decided to approach the men in the black BMW to avoid losing evidence, and seeing that "people were out everywhere," they called for marked patrol cars and uniformed officers to come to the scene.

Sergeant Southern arrived first. He initially approached the Hispanic males, whom had exited the black BMW and now stood

about ten feet right of the vehicle where they spoke to two African-American men. The two African-American men fled when Sergeant Southern identified himself as a police officer. When he arrived moments later, Detective Williams approached Sergeant Southern and the two Hispanic males. Detective Williams put the two Hispanic males in handcuffs and advised them that they were in "investigative detention" "for officer safety because [the officers] were outnumbered by the crowd . . . ." Thereafter, Detective Williams approached the BMW. He testified that he smelled "green marijuana," which he also described as "fresh marijuana or unburnt marijuana." Detective Williams opened the BMW, found the black bag in the back seat, and in that bag he discovered two freezer bags of marijuana later measured at 890 grams.

After discovering the marijuana, Detective Williams searched one of the Hispanic males and found a card identifying him as Defendant. Detective Williams then "asked [Defendant] where he was coming from prior to his arrival on Ferrell Court." Defendant responded that "he just left his residence at 1029 Thomasville Road." Because he was involved with the surveillance at 338 Barnes Road, Detective Williams suspected that Defendant did not truthfully reveal his residence. Then Detective Williams asked Defendant what he "was doing on Ferrell Court." Defendant admitted that he was there to deliver drugs. Thereafter, Detective Williams read Defendant his *Miranda* rights.

The officers at Ferrell Court communicated Defendant's arrest with Detective Jones, who remained at Defendant's residence at 338 Barnes Road with other officers that came to the scene. Some of the other officers obtained a resident's consent to search the house. Officers discovered more marijuana, large plastic bags, scales, a large amount of currency, and a .22 caliber rifle in the house. Detective Jones led a drug-sniffing dog to the storage shed, where the dog alerted. Detective Jones testified that she also smelled "a very strong odor of marijuana." She later obtained a search warrant for the shed, where police found 11.5 pounds of marijuana.

Before his trial, Defendant moved to suppress: 1) evidence recovered from the shed, contending that the search warrant was not supported by probable cause; 2) evidence recovered from the black BMW, contending that the search was not lawfully based on reasonable suspicion or probable cause; and 3) Defendant's statements, contending that officers elicited his statements in violation of his 5th Amendment rights. In its order following the suppression hearing, the trial court made the following relevant findings of fact:

1. In May of 2007, K.L. Jones, a Detective with the Winston-Salem Police Department (hereinafter "WSPD") received information from a confidential source of information that Edgar Garcia was selling marijuana at 338 Barnes Road, Lot # 40, in Winston-Salem, North Carolina.

2. The confidential source further informed Detective Jones that Edgar Garcia kept the marijuana in a storage shed adjacent to his residence at that address.

. . .

4. In July of 2007, the same confidential source of information contacted Detective Jones and told her the same information that had been communicated in May.

5. Detective Jones then utilized . . . "PISTOL", and retrieved information on the suspect Edgar Garcia. She found an address for Edgar Garcia of 338 Barnes Road, Lot #40, and that Garcia had had 18 previous contacts with law enforcement officers. Detective Jones found that Garcia had been arrested for possession of a stolen firearm, felony possession of cocaine, and discharging a firearm within city limits. . . .

6. Detective Jones performed surveillance on three separate occasions at 338 Barnes Road, Lot # 40. She observed several vehicles coming and going from that location.

7. On July 26, 2007, Detective Jones and other officers with the WSPD performed surveillance at the 338 Barnes Road location. During her surveillance of the residence, she was able to identify two vehicles as being the main vehicles that were parked at the location. One was a white Ford Mustang and the other was a black BMW. She was able to see the license plate for the BMW.

8. Detective Jones saw two Hispanic males occupying the black BMW at various times during the day. One of the males was wearing a white T-shirt with yellow plaid shorts and the other was wearing a grey shirt with blue jeans. Based on the photo she retrieved from PISTOL, Detective Jones believed Edgar Garcia was one of those Hispanic males.

. . .

10. Detective Jones later observed the same two Hispanic males coming from the area of the storage shed that was located on the

property at 338 Barnes Road, Lot #40. She saw the Hispanic male with the white t-shirt and yellow plaid shorts carrying a black bag from that location. She saw this same male place the bag behind the driver's seat in the black BMW, and she saw both Hispanic males enter the vehicle and drive off.

11. Based on her training, her 11 years as a detective with the WSPD narcotics division, the information she had previously received from a confidential source, and on her own surveillance of the residence during the month of July, Detective Jones believed the black bag contained marijuana.

. . .

14. Detectives Southern, McCready, and Williams followed the two Hispanic males in the black BMW to Ferrell Court, which is an apartment complex in the Rolling Hills neighborhood in Winston-Salem, North Carolina.

15. Detective Jones testified that Ferrell Court is a well known location for narcotics activity, including the sale of narcotics such as cocaine and marijuana. She testified that she has been involved in at least a dozen operations investigating drug activity at that location.

16. Detective Williams testified that Ferrell Court is a well known location for narcotics activity. Based on the collective knowledge of the officers involved, Detective Williams believed that the two Hispanic males were going to Ferrell Court to sell marijuana. During his law enforcement career, Detective Williams has found that narcotics traffickers and sellers often carry firearms.

From those findings of fact, the trial court deduced the following conclusions of law: 1) police had "reasonable suspicion to stop and place [Defendant] into investigatory detention"; 2) Detective Williams had probable cause to search the BMW based on his smelling marijuana emanating from the vehicle; 3) Defendant's statements "from the moment he was handcuffed to when he was read his Miranda rights are not admissible"; 4) Defendant's statements after he received his *Miranda* rights are admissible; 5) the warrant to search the shed was supported by probable cause; and 6) all evidence seized as a result of the search warrant is admissible.

After the trial court's ruling, Defendant preserved his right to appeal the rulings on his suppression motions. Thereafter, he pled

guilty to trafficking in marijuana, possession with intent to sell or deliver marijuana, maintaining a dwelling for purposes of keeping and selling a controlled substance, possession of drug paraphernalia, and maintaining a vehicle for purposes of keeping and selling a controlled substance. The trial court consolidated the convictions and sentenced Defendant to a term of 25 to 30 months imprisonment.

On appeal, Defendant argues that police lacked reasonable suspicion to stop and detain him at Ferrell Court, and as result, all statements and evidence seized after that point are subject to the exclusionary rule.[2] We disagree.

It is well established that " '[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.' " *State v. Campbell*, 359 N.C. 644, 662, 617 S.E.2d 1, 13 (2005) (quoting *United States v. Drayton*, 536 U.S. 194, 200, 153 L. Ed. 2d 242, 251 (2002)). Rather, "[t]he encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398 (1991)). At that point, the encounter may become an investigatory stop, which must be supported by reasonable suspicion to pass constitutional muster. *Id.* at 664, 617 S.E.2d at 14 (citing *Brown v. Texas*, 443 U.S. 47, 61 L. Ed. 2d 357 (1979)); *see also State v. McArn*, 159 N.C. App. 209, 212, 582 S.E.2d 371, 374 (2003) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911 (1968) ("Before a police officer may stop a vehicle and detain its occupants without a warrant, the officer must have a reasonable suspicion that criminal activity may be occurring.")).

> "[R]easonable suspicion" requires that "[t]he stop . . . be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training."

---

2. Some of Defendant's assignments of error seek to challenge the trial court's findings of fact on various grounds, but Defendant has abandoned these assignments of error by failing to specifically argue them in his brief. *See* N.C. R. App. P. 28(b)(6). Furthermore, we find competent evidence in the transcript to support every finding of fact. *See State v. Parker*, 137 N.C. App. 590, 594, 530 S.E.2d 297, 300 (2000) (this Court's function in reviewing denial of a motion to suppress is to determine "whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law") (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)).

*State v. Watkins,* 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994). All that is required is a "minimal level of objective justification, something more than an 'unparticularized suspicion or hunch.'" *Id.* at 442, 446 S.E.2d at 70 (quoting *U.S. v. Sokolow,* 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989)). A court must consider the totality of the circumstances in determining whether reasonable suspicion to make an investigatory stop existed. *Id.* at 441, 446 S.E.2d at 70.

*State v. Jacobs,* 162 N.C. App. 251, 255, 590 S.E.2d 437, 440 (2004).

Factors to determine whether reasonable suspicion existed include activity at an unusual hour, a suspect's nervousness, presence in a high-crime area, and unprovoked flight. *State v. Blackstock,* 165 N.C. App. 50, 58, 598 S.E.2d 412, 417-18 (2004), *disc. review denied,* 359 N.C. 283, 610 S.E.2d 208 (2005) (citations omitted). However, none of those factors are sufficient independently. *Id.*

An anonymous informant's tip may form the basis for reasonable suspicion, but it must exhibit "sufficient indicia of reliability." *State v. Hughes,* 353 N.C. 200, 207, 539 S.E.2d 625, 630 (2000) (citing *Florida v. J.L.,* 529 U.S. 266, 270, 146 L. Ed. 2d 254, 260 (2000)). But even "[a] tip that is somewhat lacking in reliability may still provide a basis for reasonable suspicion if it is buttressed by sufficient police corroboration." *Id.* The reliability of an anonymous tip is determined by assessing the totality of the circumstances as to what the officer knew before making the stop. *See Hughes,* 353 N.C. at 210, 539 S.E.2d at 632 (concluding that anonymous tip and subsequent police corroboration were still insufficient to create reasonable suspicion).

Here, Defendant argues that the police officers lacked reasonable suspicion before they put him into investigatory detention because the anonymous tips were insufficient and the police officers otherwise observed only innocent behavior. The anonymous tips provided specific information of illegal activity-possessing and selling marijuana. The tipster also provided a specific location-Defendant's residence. Furthermore, the tipster specifically referenced the shed, the area from which Detective Jones later observed Defendant and his partner emerge carrying a black bag they placed in the rear seat of the black BMW.

Even assuming information in the anonymous tips was insufficient to create reasonable suspicion, we hold that the trial court's findings of fact support the conclusion that the police sufficiently corroborated the anonymous tips. The tips were buttressed by Detec-

tive Jones' substantial subsequent surveillance at 338 Barnes Road. During that surveillance, Detective Jones was aware of Defendant's history of police contacts for narcotics and firearms offenses while she observed the suspects come and go at 338 Barnes Road. Furthermore, Detective Jones communicated her observations to Sergeant Southern and Detectives Williams and McReady, who followed Defendant to Ferrell Court, a location known for its drug activity. We hold that these observations sufficiently corroborated information in the anonymous tips such that the officers could reasonably suspect Defendant went to Ferrell Court to sell marijuana.

Indeed, subsequent corroboration by officers in this case contrasts with the insufficient corroborative efforts of the officers in *Hughes*. The anonymous tipster in *Hughes* alleged:

an individual nicknamed "Markie" would be arriving that day in Jacksonville by way of a bus coming from New York City, possibly the 5:30 p.m. bus. "Markie" was described as "a dark-skinned Jamaican from New York who weighs over three hundred pounds and is approximately six foot, one inch tall or taller, between twenty or thirty years of age [,] . . . who would be clean cut with a short haircut and wearing baggy pants," and who would have marijuana and powdered cocaine in his possession. The informant also indicated that Markie "sometimes" came to Jacksonville on weekends before it got dark, that he "sometimes" took a taxi from the bus station, that he "sometimes" carried an overnight bag, and that he would be headed to North Topsail Beach.

*Hughes*, 353 N.C. at 201-02, 539 S.E.2d at 627. At the bus station, the investigating officers identified the defendant, who had already gotten off a bus when the officers arrived, as matching the tipster's description. *Id.* The defendant got into a taxi immediately after getting off the bus and the officers stopped the defendant's taxi before determining whether it was traveling toward North Topsail Beach. *Id.* The Court held that officers lacked reasonable suspicion on these facts because the officers failed to "establish the reliability of the [tipster's] assertion of illegality" by neglecting to "confirm the suspect's name, the fact that he was Jamaican, or whether the bus from Rocky Mount had originated in New York City." *Id.* at 209, 539 S.E.2d at 632.

The same is not true in this case. Detective Jones corroborated the pointed information in the anonymous tips through her discoveries in the "PISTOL" system and her days of surveillance at 338 Barnes

Road. She passed this information to the arresting officers, who followed Defendant to a location known for drug activity. Accordingly, we hold that the trial court's findings of fact support its conclusion that the Winston-Salem police had "sufficient reasonable suspicion to stop and place [Defendant] into investigatory detention . . . ."

Defendant also argues that the exclusionary rule should apply to suppress his statements to police, evidence seized from the bag in the BMW, and evidence seized from the shed by search warrant obtained after his arrest. Because Defendant challenges the admission of this evidence on the sole ground that there was no reasonable suspicion to put him into investigatory detention at Ferrell Court, and we have already decided that issue to the contrary, we conclude that this assignment of error is without merit.

Affirmed.

Judge JACKSON concurs in a separate opinion.

Judge Robert N. HUNTER, Jr. concurs.

JACKSON, Judge concurring.

I concur in both the opinion and the result reached by the majority, but I write separately to express my concern regarding placing handcuffs upon defendant pursuant to an "investigatory detention" based upon reasonable suspicion. Because the phrase "investigatory detention" is ambiguous in the context of Fourth Amendment jurisprudence, I believe there is a danger of confusion posed by conflating the proper legal standards (*i.e.*, probable cause and reasonable suspicion) already inherent within a trial court's fact-specific inquiry as to whether a stop, search, or seizure passes constitutional muster.

The Supreme Court of the United States has explained that

to argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, *whether*

*these intrusions be termed "arrests" or "investigatory detentions."* We made this explicit only last Term in *Terry v. Ohio,* ... when we rejected "the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.'"

*Davis v. Mississippi,* 394 U.S. 721, 726-27, 22 L. Ed. 2d 676, 680-81 (1969) (emphasis added) (footnote call number omitted). Therefore, it is clear that the Supreme Court does not draw a bright line between "arrests" and "investigatory detentions," but instead focuses on the intrusive nature of the activity involved.

The Supreme Court of North Carolina, as well as prior opinions of this Court have stated that so-called investigatory detentions are permitted upon reasonable suspicion. *See, e.g., State v. Styles,* 362 N.C. 412, 414, 665 S.E.2d 438, 439 (2008) (citations omitted); *State v. Sanchez,* 147 N.C. App. 619, 623, 556 S.E.2d 602, 606 (2001). In these opinions, North Carolina's appellate Courts have used "investigatory detention" as a synonym for "investigatory stop."[3]

In view of our precedent, and upon the facts presented, I would construe the limited "investigatory detention" in case *sub judice* as an "investigatory stop" which was supported by reasonable suspicion pursuant to an informant's tip and independent police corroboration. Having construed the "investigative detention" as an "investigative stop," Detective Williams permissibly used handcuffs to put the two Hispanic males into a limited "investigative detention" "for officer safety" prior to obtaining probable cause to arrest defendant. *See State v. Campbell,* 188 N.C. App. 701, 708-12, 656 S.E.2d 721, 727-29 (affirming the use of handcuffs during an investigative stop after explaining that "when conducting investigative stops, police officers are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'") (quoting *United States v. Hensley,* 469 U.S. 221, 235, 83 L. Ed. 2d 604, 616 (1985)), *appeal dismissed,* 362 N.C. 364, 664 S.E.2d 311 (2008).

With the foregoing caveat, I join the majority.

---

3. Although both *Styles* and *Sanchez* are factually distinct from the case *sub judice* insofar as they involve "traffic stops" as opposed to traditional *"Terry* stops," reasonable suspicion provides the legal justification required to initiate the stop in both instances. *See, e.g., Illinois v. Wardlow,* 528 U.S. 119, 123, 145 L. Ed. 2d 570, 576 (2000).