STATE OF NORTH CAROLINA v. ANTHONY LENAIR CAMPBELL

No. COA07-903

(Filed 19 February 2008)

**Search and Seizure— investigatory stop—reasonable suspicion—scope—handcuffs—frisking—probable cause for arrest**

The trial court properly denied defendant's motion to suppress physical evidence found on defendant's person and in his backpack at the time of his investigatory stop and subsequent arrest where: (a) an officer had a reasonable suspicion that defendant was engaged in criminal activity so that her investigatory stop of defendant was lawful when she saw him riding his bicycle in the vicinity of a reported burglary at 3:40 a.m. and saw no other persons in the area; (2) the officers' act of handcuffing defendant and searching his person did not constitute an unreasonable seizure where one officer recognized defendant and believed that defendant posed a risk of flight, and a frisk of defendant for weapons was justified in light of the late hour and nature of the crime that had been committed; and (3) officers had probable cause to arrest defendant for possession of burglary tools when, during the frisk of defendant, an officer discovered a small flashlight and a Swiss army-type knife, an officer at the burglary scene reported that a window had been pried open with some type of screwdriver, the arresting officer believed that a part of that knife could have been used to open a window, and defendant had a backpack with him that contained unknown items.

Appeal by defendant from order entered 15 December 2006 by Judge R. Allen Baddour in Orange County Superior Court. Heard in the Court of Appeals 13 December 2007.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Marc Bernstein, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel R. Pollitt, for defendant-appellant.*

JACKSON, Judge.

Anthony Lenair Campbell ("defendant") appeals from his convictions entered upon guilty pleas for possession of burglary tools and possession of drug paraphernalia. Specifically, he appeals from an

order of the trial court denying his motion to suppress. For the following reasons, we affirm.

At approximately 3:40 a.m. on 24 July 2006, Officer Thomas Coyle ("Officer Coyle") of the Carrboro Police Department responded to a report of a breaking and entering in progress at 109 South Peak Drive in Carrboro, North Carolina. Coyle was the first to respond and arrived within three minutes of the call. While driving toward the location of the alleged breaking and entering, Officer Coyle turned onto Old Pittsboro Road and observed someone riding a bicycle on the road. Old Pittsboro Road does not intersect with South Peak Drive, but is connected to it via Daffodil Lane, and Officer Coyle testified that Old Pittsboro Road is "close" to South Peak Drive. Officer Coyle observed that the rear of the bicycle had a flashing red light. At the time, Officer Coyle and the bicycle rider were within a quarter of a mile of the location of the alleged breaking and entering, and the trial court found that the bicyclist "was in the vicinity of 109 S[outh] Peak Drive." Officer Coyle did not observe anyone else in the area. He radioed other officers about the bicycle rider "[i]n case that person may be involved with the breaking and entering," and proceeded to the house at 109 South Peak Drive. During his investigation at the residence at 109 South Peak Drive, Officer Coyle observed that a window had been opened with "a small, flathead screwdriver or a pry tool," and he notified other officers of that information.

Officer Michelle Gandy ("Officer Gandy") of the Carrboro Police Department testified that she was on patrol in her police vehicle when she responded to the call concerning the alleged breaking and entering in progress at 109 South Peak Drive. Officer Gandy also received Officer Coyle's call concerning the bicyclist, and she observed defendant riding on a bicycle and turning from Old Pittsboro Road onto South Greensboro Street. Defendant had an illuminated light on his cap, and the bicycle had a headlight and two flashing rear reflectors. Officer Gandy testified that she recognized defendant "by face[,] not name." Officer Gandy drove past defendant, turned around, drove back past defendant, and pulled off the road into a parking lot. Officer Gandy watched as defendant took a right turn onto the uphill on-ramp of Highway 54 West Bypass. Defendant stopped at the top of hill, and Officer Gandy turned on her overhead lights and spotlights. She observed that defendant was wearing a backpack and was "playing with something in his backpack." Officer Gandy testified that she stopped defendant because he was "coming from the area that the burglary came out of."

As defendant stood with his bicycle, Officer Gandy exited her vehicle and approached defendant. Officer Gandy asked defendant for his name and identification, and he complied. Lieutenant Rodney Taylor ("Lieutenant Taylor") of the Carrboro Police Department then arrived at the scene. Lieutenant Taylor recognized defendant and "knew that he had an extensive history of breaking and enterings [sic] and crimes of that nature as well as being a substance abuser." Officer Gandy asked defendant "where he was coming from," and defendant replied that he was coming from a friend's house on Laurel Avenue. Officer Gandy was aware that Laurel Avenue is off of Jones Ferry Road.

Officer Gandy asked defendant to step off of the bicycle, and Lieutenant Taylor instructed Officer Gandy to place defendant in investigative detention because he knew defendant had "run before and things of that nature." Officer Gandy and defendant walked to the front of the patrol car, where she handcuffed him and frisked him for "officer safety." Officer Gandy testified that defendant had not done anything to make her feel nervous or scared, but noted that defendant could have been "carrying anything from a pen that has a knife enclosed in it to a small handgun." Lieutenant Taylor moved defendant's bicycle off of the road, and during the frisk, "Officer Coyle advised [Officer Gandy] and Lieutenant Taylor that it appeared that some type of screwdriver had been used to pry the window open." Officer Gandy noticed that defendant was wearing two pairs of shorts—a "sports" pair on top without pockets and another pair underneath that had pockets. She felt items in his pockets and asked what they were. Defendant told Officer Gandy to take the items out, and Officer Gandy observed that the items were "[a] small flashlight and a Swiss Army-type knife." No evidence was introduced about the size or shape of the knife, or whether or not the instrument could have be used for prying, but Officer Gandy testified that she "believed that he [defendant] could have used at least part of that Swiss Army knife to open that window." Upon Lieutenant Taylor's instruction, Officer Gandy placed defendant under arrest. While conducting a search incident to arrest, Lieutenant Taylor found in defendant's backpack "[a] lot of different things from jewelry to tools." Specifically, the officers seized from the backpack multiple tools, two crack pipes, rolling papers, a crowbar, and screwdrivers.

On 30 October 2006, defendant was indicted for first-degree burglary, possession of burglary tools, and possession of drug paraphernalia. Defendant moved to suppress the physical evidence seized dur-

ing his arrest, and on 15 December 2006, the trial court entered an order denying his motion. Defendant gave notice of his intent to appeal the trial court's denial of his motion to suppress. Defendant then pled guilty to possession of burglary tools and possession of drug paraphernalia. The trial court consolidated the convictions and sentenced defendant as a prior record level IV offender to seven to nine months imprisonment.

On appeal, defendant contends that the trial court erred by denying his motion on the grounds that (1) Officer Gandy stopped defendant without reasonable suspicion in violation of the Fourth Amendment; (2) the officers unreasonably seized and searched defendant after they stopped him in violation of the Fourth Amendment; and (3) the officers arrested defendant without probable cause in violation of the Fourth Amendment.

"It is well established that the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), *cert. denied*, 531 U.S. 1165, 148 L. Ed. 2d 992 (2001)). In addition, findings of fact to which defendant failed to assign error are binding on appeal. *See State v. Lacey*, 175 N.C. App. 370, 376, 623 S.E.2d 351, 355 (2006). " 'Once this Court concludes that the trial court's findings of fact are supported by the evidence, then this Court's next task "is to determine whether the trial court's conclusion[s] of law [are] supported by the findings." ' " *Brewington*, 352 N.C. at 498-99, 532 S.E.2d at 502 (alterations in original) (quoting *State v. Steen*, 352 N.C. 227, 237, 536 S.E.2d 1, 7 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001)). "[T]he trial court's conclusions of law are reviewed *de novo* and must be legally correct." *State v. Pickard*, 178 N.C. App. 330, 334, 631 S.E.2d 203, 206, *appeal dismissed and disc. rev. denied*, 361 N.C. 177, 640 S.E.2d 59 (2006).

Defendant first contends that the evidence should have been suppressed because Officer Gandy lacked reasonable suspicion to stop him. We disagree.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, protects the right of people to be free from unreasonable searches and seizures. *See State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994). This protection "applies to seizures

of the person, including brief investigatory detentions." *Id.*[1] As our Supreme Court has explained,

> [o]nly unreasonable investigatory stops are unconstitutional. An investigatory stop must be justified by a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.[2]

> A court must consider the totality of the circumstances—the whole picture [—] in determining whether a reasonable suspicion to make an investigatory stop exists. The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. The only requirement is a minimal level of objective justification, something more than an unparticularized suspicion or hunch.

*Id.* at 441-42, 446 S.E.2d at 70 (internal quotation marks and citations omitted). It is well-settled that the standard for reasonable suspicion is "less demanding than that for probable cause." *Sokolow*, 490 U.S. at 7, 104 L. Ed. 2d at 10.

In the instant case, defendant contends that he was stopped without reasonable suspicion and offers various factors tending to diminish the State's assertion of reasonable suspicion. Specifically, defendant contends that the evidence demonstrates that (1) Officer Gandy had received no specific information about the alleged burglar or burglary; (2) defendant's conduct and appearance were not suspicious or unusual, and he would not have had so many lights on his bicycle if he had just committed a burglary; (3) the location was not in a high-crime, suspicious, or isolated area; (4) defendant's reaction was not suspicious, and he did not attempt to avoid the police; and (5) Officer Gandy recognized defendant's face but there is no evi-

---

1. "[S]topping a car and detaining its occupants constitute[s] a seizure within the meaning of the Fourth Amendment," *United States v. Hensley*, 469 U.S. 221, 226, 83 L. Ed. 2d 604, 610 (1985), and the principle applies to stopping and detaining a person riding a bicycle. *See Brooks v. Pembroke City Jail*, 722 F. Supp. 1294, 1298 (E.D.N.C. 1989).

2. Although defendant argues that the trial court applied the incorrect legal standard by concluding that "criminal activity was afoot," the trial court's conclusion tracks the language used by the United States Supreme Court. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that *criminal activity 'may be afoot,'* even if the officer lacks probable cause." (emphasis added) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911 (1968))).

dence that Officer Gandy knew any specifics about defendant or his prior criminal record. The trial court's findings of fact include some of these factors, and the record supports several of the other factors asserted by defendant. The record also includes facts not specifically found by the trial court that would tend to support a showing of reasonable suspicion. For example, before Officer Gandy stopped defendant, he had stopped on the highway on-ramp and was "playing with something in his backpack" until "he turned around and looked at [Officer Gandy]." Such activity—particularly when viewed in connection with the time of day, absence of other persons in the area, and proximity to the scene of the crime—could be considered suspicious. Nevertheless, this Court's task is not to review the record *de novo* for every fact that may tend to support or defeat a showing of reasonable suspicion. Instead, our role is simply to determine whether the trial court's findings of fact are supported by the evidence and whether those findings support the court's conclusions of law. *See Brewington,* 352 N.C. at 498-99, 532 S.E.2d at 502.

Defendant attempts to refute the facts found by the trial court that tend to support a finding of reasonable suspicion, to wit: (1) proximity to the alleged burglary; (2) time of day; and (3) the absence of any other persons in the area.

First, defendant argues that proximity to a crime scene, time of day, and the absence of other persons in the vicinity of a crime scene are insufficient, in and of themselves, to establish reasonable suspicion. We agree. *See, e.g., State v. Cooper,* 186 N.C. App. 100, 107, 649 S.E.2d 664, 669 (2007) (holding that proximity to a crime scene, without more, was insufficient to establish reasonable suspicion); *State v. Blackstock,* 165 N.C. App. 50, 58, 598 S.E.2d 412, 417-18 (2004) (noting that "activity at an unusual hour" may be considered but is not sufficient by itself to establish reasonable suspicion), *appeal dismissed and disc. rev. denied,* 359 N.C. 283, 610 S.E.2d 208 (2005).

However, it is well-settled that factors supporting reasonable suspicion are not to be viewed in isolation. *See United States v. Arvizu,* 534 U.S. 266, 274, 151 L. Ed. 2d 740, 750 (2002) ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase."). The proximity to a crime scene, the time of day, or the absence of other persons in and of themselves may be insufficient to establish reasonable suspicion, but taken together, such factors certainly may suffice. *See State v. Crenshaw,* 144 N.C. App. 574, 577, 551 S.E.2d 147, 150 (2001)

("[I]ndividually, any of the factors cited [in articulating reasonable suspicion] might not justify a search, but one cannot piecemeal this analysis. One piece of sand may not make a beach, but courts will not be made to look at each grain in isolation and conclude there is no seashore." (internal quotation marks and citation omitted)).

Defendant next argues that he was seen approximately a quarter of a mile away from, as opposed to at or immediately near, 109 South Peak Drive. Defendant, therefore, contends that the trial court's findings that he was seen "in the vicinity of 109 South Peak Drive" and "coming from the area of the burglary" are not supported by the evidence. "Vicinity," however, is a relative term,[3] and under the circumstances of this case, the trial court's use of the word "vicinity" to describe a distance of a quarter of a mile is not unreasonable. *See, e.g., State v. Reaves*, 132 N.C. App. 615, 617, 513 S.E.2d 562, 564 (using the word "vicinity" to describe a distance of one-half mile), *disc. rev. denied*, 350 N.C. 846, 539 S.E.2d 4 (1999); *see also Nashville, C. & St. L. Ry. Co. v. Sutton*, 104 S.W.2d 834, 844 (Tenn. Ct. App. 1936) ("The word 'vicinity' is a relative term, and there is nothing erroneous or inaccurate in referring to a spring or a home situated two miles from a railroad station as being in the vicinity of such station."). Furthermore, although the evidence does not establish that defendant was seen coming from 109 South Peak Drive, the evidence does demonstrate that defendant was seen "coming from the *area*" of 109 South Peak Drive. Defendant was riding on Old Pittsboro Road—which Officer Coyle described as "close" to South Peak Drive—in a direction heading away from South Peak Drive. Defendant's contention that he "was no more 'coming from' South Peak Drive than he was coming from any other location in Carrboro" is without merit.

Defendant also attempts to diminish the significance of the time of the stop. Specifically, defendant contends in his brief that "[r]iding a bicycle at 3:40 a.m. in Carrboro, especially on a late summer night in clear weather, is not suspicious," and in his reply brief, defendant argues that "[e]veryone knows this hour is not unusually late in Carrboro. Further the stop occurred on a July sum-

---

3. *See State v. Stumbo*, 111 N.W.2d 664, 665-66 (Iowa 1961) ("The ordinary and common usage of the word 'vicinity' is a relative term, synonymous with such words as 'neighborhood', 'community' or 'locality', 'not remote', 'nearness', and describes a state of being near." (citations omitted)). In *Stumbo*, the Iowa Supreme Court also noted that "the word 'vicinity' is derived from '*vicus*', a village, and signifies a place which does not exceed in distance the extent of a village." *Id.* at 666 (citing *Borough of Madison v. Morristown Gaslight Co.*, 52 A. 158, 159 (N.J. Ch. 1902), *rev'd on other grounds*, 54 A. 439 (N.J. 1903)).

STATE v. CAMPBELL

[188 N.C. App. 701 (2008)]

mer night in clear weather, a perfect time for a bicycle ride home in this late-night bohemian college town."[4] However, defendant's description of Carrboro in the early morning hours is belied by the trial court's finding of fact, to which defendant did not assign error, that "Officer Coyle observed *no one else* in the vicinity of 109 S[outh] Peak Drive at that time." (Emphasis added). Furthermore, our Supreme Court has described a similar time of day as "an unusual hour for persons to be going about their business." *State v. Rinck*, 303 N.C. 551, 560, 280 S.E.2d 912, 920 (1981) (approximately 1:35 a.m.); *see also Watkins*, 337 N.C. at 442, 446 S.E.2d at 70 (labeling 3:00 a.m. an "unusual hour").

Finally, defendant contends that the "officers' failure to see anyone else in the vicinity is not [a] reasonable justification to stop defendant." Although this factor alone may not be a sufficient justification for a stop, the absence of other individuals in the vicinity is a valid factor for officers to use in determining whether reasonable suspicion exists to stop an individual. *See, e.g., United States v. Moore*, 817 F.2d 1105, 1106 (4th Cir.) (noting that "[t]he area was otherwise deserted."), *cert. denied*, 484 U.S. 965, 98 L. Ed. 2d 396 (1987).

Accordingly, contrary to defendant's contentions, the trial court's findings—specifically, with respect to his proximity to 109 South Peak Drive, the time of day, and the absence of other persons in the area—are supported by competent evidence. These findings, in turn, support the trial court's conclusion that reasonable suspicion supported Officer Gandy's stop of defendant. Therefore, defendant's assignment of error is overruled.

Defendant next contends that the evidence should have been suppressed because, even assuming that Officer Gandy had reasonable suspicion to stop him, Officer Gandy and Lieutenant Taylor escalated the stop and unreasonably seized and searched him without justification. We disagree.

During an investigative stop, the investigative methods employed by police should be the least intrusive means reasonably available to effectuate the purpose of the stop. *See State v. Allison*, 148 N.C. App. 702, 706, 559 S.E.2d 828, 831 (2002) (citing *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238 (1983)). Nevertheless, when conduct-

---

4. We must caution defense counsel against arguing facts not in the record. There was no evidence introduced relating to typical bicycle traffic in Carrboro under similar conditions, and such a subject is inappropriate for judicial notice. *See Greer v. Greer*, 175 N.C. App. 464, 472, 624 S.E.2d 423, 428 (2006) ("Any subject, however, that is open to reasonable debate is not appropriate for judicial notice.").

ing investigative stops, police officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235, 83 L. Ed. 2d at 616. As Maryland's high court recently noted,

> the permissible scope of a *Terry* stop has expanded in the past few decades, allowing police officers to neutralize dangerous suspects during an investigative detention using measures of force such as placing handcuffs on suspects, placing the suspect in the back of police cruisers, drawing weapons, and other forms of force typically used during an arrest. .

*Longshore v. State*, 924 A.2d 1129, 1142 (Md. 2007); *see, e.g., United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (listing examples from the Eighth Circuit when handcuffs were permitted in investigative detentions), *cert. denied*, 549 U.S. 1272, 167 L. Ed. 2d 241 (2007); *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) (listing examples from the Eleventh Circuit), *cert. denied*, 550 U.S. 956, 167 L. Ed. 2d 1129 (2007).

In the instant case, the trial court found that there were "prior occasions in which the Defendant had fled from law enforcement." This finding is supported by Lieutenant Taylor's testimony that he recognized defendant and believed that defendant posed a risk of flight. Specifically, Lieutenant Taylor testified, "I know that he [defendant] has run before and things of that nature." Further, although defendant cooperated with Officer Gandy and Lieutenant Taylor, his cooperation did not necessarily eliminate the risk of flight. *See State v. Blackmore*, 925 P.2d 1347, 1351 (Ariz. 1996) (declining to find "that defendant's subsequent cooperation should have dispelled any reasonable concerns that he posed a flight risk" and further noting that, as in the instant case, "[t]he burglary victims had not seen the perpetrator and therefore did not know if he or she was armed. As a result, [the investigating officer] could not know whether defendant, whom he reasonably suspected of committing the burglary, was armed."). By handcuffing defendant, Officer Gandy and Lieutenant Taylor sought "to maintain the status quo" of the situation, *Hensley*, 469 U.S. at 235, 83 L. Ed. 2d at 616, and therefore, their handcuffing of defendant was reasonable under the circumstances. *See United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) ("The amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent

flight."), *cert. denied*, 494 U.S. 1069, 108 L. Ed. 2d 792 (1990); *accord United States v. Nava*, 363 F.3d 942, 945 (9th Cir.), *cert. denied*, 543 U.S. 973, 160 L. Ed. 2d 347 (2004).

In addition to the use of handcuffs, we hold that the officers were justified in frisking defendant based upon the late hour and the nature of the crime committed. *See Moore*, 817 F.2d at 1108 ("The circumstances surrounding the stop support the officer's belief that a further frisk for weapons was warranted. The hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons."). As Officer Gandy noted, although defendant may not have displayed a weapon, he could have been "carrying anything from a pen that has a knife enclosed in it to a small handgun." Therefore, the frisk was justified based upon the circumstances with which Officer Gandy and Lieutenant Taylor were presented.

Accordingly, the trial court's conclusion that, "for officer safety,"[5] the officers were justified in temporarily detaining and frisking defendant was supported by the findings of fact, which, in turn, were supported by the evidence. Defendant's assignment of error, therefore, is overruled.

Finally, defendant argues that even if Officer Gandy had reasonable suspicion to stop him and even if the detention and search were reasonable, Officer Gandy lacked probable cause to arrest him for possession of burglary tools. We disagree.

As our Supreme Court has explained,

[p]robable cause for an arrest has been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. To establish probable cause the evidence need not amount to proof of guilt, or even to prima facie evidence of guilt, but it must be such as would actuate a reasonable man acting in good faith. Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

---

5. We note that defendant disputes the State's contention that his handcuffing was for officer safety but did not assign error to the trial court's finding that "Officer Gandy . . . frisked the defendant for officer safety."

*State v. Bone,* 354 N.C. 1, 10, 550 S.E.2d 482, 488 (2001) (internal quotation marks, alterations, and citations omitted), *cert. denied,* 535 U.S. 940, 152 L. Ed. 2d 231 (2002).

Pursuant to North Carolina General Statutes, section 14-55, "[i]f any person . . . shall be found having in his possession, without lawful excuse, any picklock, key, bit, or other implement of housebreaking . . . , such person shall be punished as a Class I felon." N.C. Gen. Stat. § 14-55 (2005). "The essential elements of the crime with which the defendant is charged are (1) the possession of an implement of housebreaking (2) without lawful excuse, and the State has the burden of proving both of these elements." *State v. Stockton,* 13 N.C. App. 287, 290, 185 S.E.2d 459, 461-62 (1971). Although the statute "does not require proof of any specific intent to break into a particular building at a particular time and place," the statute does require "that the defendant possessed the article in question with a general intent to use it at some time for the purpose of facilitating a breaking." *State v. Bagley,* 300 N.C. 736, 740-41, 268 S.E.2d 77, 79-80 (1980).

In the case *sub judice,* Officer Gandy testified that during the *Terry* frisk, she "could feel items in [defendant's] pockets" and "asked him what was in the pocket that I was touching." Defendant told Officer Gandy "to go ahead and take it *out,*" whereupon Officer Gandy emptied defendant's pockets and discovered "[a] small flashlight and a Swiss Army-type knife." Meanwhile, "[d]uring the frisk, Officer Coyle advised [Officer Gandy] and Lieutenant Taylor that it appeared that some type of screwdriver had been used to pry the window [at 109 South Peak Drive] open." Although, as defendant notes and the trial court found, "[n]o evidence was introduced about the size or shape of the knife, or whether or not there were other tools, such as a pry tool or screwdriver, in the swiss army-style knife," Officer Gandy expressly testified, "At that point I believed he could have used at least part of that Swiss Army knife to open that window." Following the discovery of the flashlight and knife, the officers placed defendant under arrest.

Quoting from our Supreme Court, defendant first contends, correctly, that "flashlights . . . are not breaking tools." *State v. Morgan,* 268 N.C. 214, 220, 150 S.E.2d 377, 381 (1966). However, based upon Officer Coyle's description of the type of instrument likely used on the window at 109 South Peak Drive, Officer Gandy determined that defendant "could have used at least part of that Swiss Army knife to open that window." In addition to the knife and her belief that it could have been used to open a window, Officer Gandy's suspicion that

defendant possessed implements of housebreaking was supported by (1) defendant's possession of the flashlight; (2) defendant's possession of the backpack containing unknown items; and (3) all of the factors supporting the finding of reasonable suspicion for the initial stop of defendant. *See In re I.R.T.*, 184 N.C. App. 579, 587, 647 S.E.2d 129, 136 (2007) ("[W]e find probable cause based on the same factors in which we found reasonable suspicion to conduct the investigatory seizure."). The trial court, therefore, properly concluded that "[t]here was probable cause to arrest the Defendant in this case for possession of burglary tools." Accordingly, defendant's assignment of error is overruled.

Defendant has failed to present argument in his brief with respect to assignments of error numbers 2, 4 through 8, and 15. Accordingly, these assignments of error are deemed abandoned. *See* N.C. R. App. P. 28(b)(6) (2006).

Affirmed.

Judges TYSON and ARROWOOD concur.