NO. COA13-791

NORTH CAROLINA COURT OF APPEALS

Filed: 18 February 2014

STATE OF NORTH CAROLINA

   v.                         Durham County
                                    No. 10 CRS 62009

DEVINE DRAKKAR THORPE

Appeal by defendant from order entered 28 July 2011 by Judge Orlando Hudson and judgment entered 3 August 2011 by Judge Carl R. Fox in Durham County Superior Court. Heard in the Court of Appeals 12 December 2013.

> *Attorney General Roy Cooper, by Assistant Attorney General Melissa H. Taylor, for the State.*

> *Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Paul M. Green, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Devine Thorpe ("Defendant") appeals from the denial of his motion to suppress, arguing (1) that the conduct and duration of his detention constituted a warrantless arrest that required probable cause; (2) that statements taken at the police station after his arrest were impermissible fruits of the unlawful arrest; (3) that Defendant's statement taken in a police car was done in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); (4) that Defendant's statements to the arresting officer were coerced; and

(5) that Defendant's statements taken at the police station were also taken in violation of the United States Supreme Court's ruling in *Missouri v. Seibert*, 542 U.S. 600 (2004).

We conclude that the trial court failed to make adequate findings to permit review of its determination that Defendant was not placed under arrest when he was detained for nearly two hours. Specifically, on remand the trial court must make appropriate findings about whether Officer Mellown diligently pursued his investigation so as to justify an extended detention.

## I. Facts & Procedural History

On 7 February 2011, Defendant was indicted in Durham County on one count of Felonious Breaking and/or Entering and one count of Conspiracy to Commit Felonious Breaking and Entering. On 25 April 2011, Defendant moved to suppress the oral and written statements he made to investigating officers, alleging that they were taken in violation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights. The State moved to dismiss Defendant's motion. Durham Superior Court Judge Orlando Hudson held a suppression hearing on Defendant's motion on 29 June 2011. The trial court denied Defendant's motion to suppress orally at the hearing and filed a written order on 28 July 2011. The transcript of the hearing tended to show the following facts.

T.J. Mellown ("Officer Mellown") is an investigator with the Durham County Sheriff's Office, where he has worked since August 1997. Officer Mellown testified that on 10 December 2010, he was on duty as radio calls were made about the incident around 11:00 a.m. Officer Mellown said there were "various calls on the radio that there had been a subject who had been found shot" and that a residence was broken into in the southern part of Durham County. Officer Mellown also said there were conflicting radio reports of multiple subjects fleeing the scene. Officer Mellown said he heard that a number of other officers were heading to the scene, so instead he went to Duke Hospital arriving around 11:00 a.m. Officer Mellown previously worked in emergency medicine and said

> I've seen situations like this that have happened before where people have been shot during the commission of a crime. My experience has been that, lots of times, people will drive themselves to the hospital. I thought that if one person had been shot, there was a chance that other people had been shot, and so I went to the ER to see if anybody would show up.

When Officer Mellown reached Duke Hospital, he testified that he parked his vehicle in front of the emergency department and stepped inside the hospital. Officer Mellown told the security guards why he was present and that he "was waiting to see if anyone would show up from this incident." Officer Mellown said he began

"calling the emergency departments over at Durham Regional Hospitals and also at UNC Hospitals" to ask them to contact him if anyone arrived in a personally owned vehicle with a gunshot wound.

After "approximately ten minutes," Officer Mellown testified he saw a white Dodge Charger pull in front of the emergency room. Officer Mellown said two men, Defendant and Gary Brady ("Brady"), pulled a critically injured passenger from the front passenger seat. Officer Mellown believed the man was shot and said "it looked like he was going to die in about the next hour or so." Officer Mellown saw Defendant as one of the men pulling the passenger from the car, although he "wasn't sure what his role was in relation to this incident at all," but that he had a "hunch" that Defendant was involved.

Officer Mellown said he was concerned about the safety of Defendant and the public, and so he attempted to detain Defendant and the other young man as they approached the front of the hospital. Officer Mellown frisked both Defendant and Brady, although he "did not know what was going on" at that time. Officer Mellown said Defendant and Brady were "very emotionally charged up. They were upset, they were excited. When I tried to tell them that I needed to pat them down, that I needed to figure out what was going on before anything else happened, there was a lot

of yelling back and forth." Officer Mellown said Defendant and Brady "told [him] that [he] did not have the right to detain them, that [he] didn't have the right to pat them down." Officer Mellown said it took a few minutes to calm everyone down to a level where he could proceed. Officer Mellown then performed a pat down and found no weapons on Defendant or Brady. During the pat down, Officer Mellown noticed a gunshot wound to Brady's arm and subsequently Brady was taken by the Duke nursing staff for treatment.

Officer Mellown said he then handcuffed Defendant, took Defendant to his police car, put Defendant in the front passenger seat, and then sat in the driver's seat next to Defendant. Officer Mellown told Defendant "he was being detained, and I had to find out what was going on before I knew what to do." Officer Mellown explicitly told Defendant he was not under arrest, but also said Defendant was not free to leave his vehicle.

Officer Mellown said Defendant "made no verbal threats," but that Defendant "was edging into personal space" while Officer Mellown was frisking Brady. Officer Mellown did not provide *Miranda* warnings at that time to Defendant, and began asking where the man who was shot came from, Defendant's date of birth, and other demographic questions. Defendant responded to Officer

Mellown's questioning by telling him he was playing "video games with some people on the house on Rowena Avenue, and that he [received] a phone call saying that his cousin had been shot in some area behind Parkwood, and that he went there, picked up his cousin, and drove him to the hospital." Officer Mellown said he went through this story a few times with Defendant, who at that point did not admit to anything beyond that statement. Officer Mellown's "concern[s] about gang reprisals kind of went away after [Defendant] told me where they picked up the gentleman who had been shot at."

After ten or fifteen minutes of questioning, Officer Mellown placed Defendant with one of the security guards at the hospital, and "left him sort of in the care of him," while Defendant was still handcuffed. Officer Mellown then went to speak with Brady, saying that there was not a "solemn decision that [Defendant] was going to be arrested" at that time. Defendant was not placed under formal arrest until he was taken to the police station at around 1 p.m.

Officer Mellown said he placed Defendant under formal arrest because he received "statements from some of the other persons involved as to why they had been there . . . that they were involved in breaking into the residence, that this was related to the

shooting for which I had gone out to the ER." Officer Mellown also researched the location of Rowena Avenue and said Defendant's statements of traveling from Rowena to Parkwood to retrieve his wounded cousin were not feasible given the timing and sequence of events. Officer Mellown also spoke with Brady, who stated that "they" were driving around, broke into a home, and were shot. After Brady was given *Miranda* warnings, he declined to make any further statements.

Defendant was transported by other officers in a "marked car, with the cage in the back" to the police station. At the police station, Defendant was advised that he was under arrest and given *Miranda* warnings. Defendant asked why he was under arrest and began to cry once being informed he was under arrest. Officer Mellown was present during the videotaped interview and was accompanied by Sergeant Davis. Officer Mellown said Sergeant Davis raised his voice during the interview, pointed his finger at Defendant, and told Defendant to cooperate with Officer Mellown. Defendant waived his *Miranda* rights at that time orally and shortly after by written waiver. After the videotaping ceased, Officer Mellown asked Defendant to clarify his statement to add an admission of breaking and entering, which Officer Mellown said Defendant admitted during their conversation.

In the videotaped interview, Officer Mellown said Defendant admitted to taking part in the breaking and entering of the home:

> He told me that he had spent the night at a house on Ruby Ridge, which is a small housing development in eastern Durham, and that he had spent the night there. Some people came over and woke him up at, I believe, about 8:30 in the morning.
>
> They asked him to -- they asked him to drive them around. Eventually, they drove to a small area behind Parkwood, where they asked him to let them off at a small house that he described as, I think, being tucked back in the woods.
>
> He drove around a little bit. They gave him a call on a cell phone. He drove back to the area, and found that his -- I believe the gentleman's name was Omari Eubanks had been shot in the back. And he was lying on the -- on the yard outside one of the neighboring residences.
>
> And, I'm sorry, I'm not sure if it was Omari that he picked up or the other one. But one of his companions had been shot in the back, was lying in the -- in the yard in a nearby house.
>
> . . . .
>
> Initially in the car, he just told me that he had been playing video games on Rowena Avenue and that he received a phone call, drove to Parkwood and drove around, found where his cousin had been shot, picked him up and drove him to -- drove him to Duke.
>
> When we Mirandized him and he made a statement, he changed that to he took these -- his companions to, I believe, a Shell station that was off of Highway 54 near Southpoint, dropped them off at the Shell

station.

> We kind of explored that a little bit further, and he told me that he actually picked them -- or they actually left Ruby Ridge, started driving around, found the house that was tucked back in in [sic] the woods.
>
> He dropped them off at the house, drove around for a few minutes, got a phone call to come pick up his cousin, who had been shot, drove back to the residence, picked up his cousin and then drove to Duke.

Defendant was indicted on 7 February 2011. On 25 April 2011 Defendant filed a motion to suppress his statements made to Officer Mellown and at the police station, which was denied on 28 July 2011 via written order. In the trial court's written order, the trial court made the following findings of fact:

> 1. On or about December 10, 2010 at or about 11:19 a.m., Investigator Mellown of the Durham Police Department arrived at Duke Emergency Department.
>
> 2. At or about 11:30 a.m. Investigator Mellown was standing in the area near the entrance to the waiting room when he saw two black males dragging a third black male from a white Dodge Charger. Investigator Mellown observed that the black male being dragged from the car was "limp and appeared to have a diminished level of consciousness."
>
> 3. After emergency room staff took that third person to the patient care area for treatment, Investigator Mellown attempted to detain the other two persons. The other two persons were "both aggressive, belligerent, and noncompliant with orders."

4. Investigator Mellown was able to determine that the shorter of the two persons had been shot in the arm. A security officer escorted him to the triage nurse for treatment, and the other person, subsequently identified as defendant Devine Thorpe, was handcuffed and searched.

5. After approximately ten minutes, Defendant had calmed down to the point where Investigator Mellown was able to talk to him without raising his voice. Investigator Mellown escorted Defendant to his vehicle, and placed him in the front passenger's seat. Defendant remained handcuffed.

6. Investigator Mellown advised Defendant that "he was not under arrest, but that I was going to be detaining him until I could determine what was taking place. I told him that I did not know why he was there, or why his friend had been shot, and that I had to find out what was going on before I knew how to proceed with this situation."

7. In response, Defendant told Investigator Mellown his name and date of birth. Defendant also stated that "he was at this residence at 1134 Rowena Ave when he got a call from someone stating that his cousin had been shot. This person told Thorpe to go pick up his cousin near Parkwood. Thorpe said that he drove to Parkwood and found his brother lying on the side of the road. He stated that he put his cousin in the car, and then drove to Duke. Thorpe clarified his story to tell me that his cousin's name was Omari Mitchell."

8. Investigator Mellown told Defendant that he was having a hard time working out a time line of these events, and asked him to tell him again what happened. Defendant stated the same thing.

9. After approximately fifteen minutes, Investigator Mellown escorted Defendant back to the security office at the Emergency Room and left him with a security guard.

10. It is unclear how long Defendant remained held in the security office until Investigator Mellown took Defendant down to the police station.

11. At approximately 1:18 p.m. Investigator Mellown advised Defendant of his Miranda Rights.

12. At or about 1:20 p.m. Defendant signed the waiver of his rights form. He then made a statement that "This morning I woke up and was asked to ride with Omari, James, and Feet. An [sic] we rode to Parkwood where a lot of houses were and I let them out of the car. So they get out and I pulled off. After about 20 mins,[sic] I get a phone call saying that Omari, James, and Feet has [sic] been shot. So, I turn the car around and drive through parkwood [sic] to find them as I come to an entersection [sic] I see Omari laying in the road and I helped him in the car and took him to the hospital. /s/ Devin Thorpe 9-24-1990."

The trial court then made the following conclusions of law:

1. Investigator Mellown had reasonable suspicion to detain the Defendant and perform an investigative stop.

2. The Defendant was not in custody at the time he gave his first statement to Detective Mellown.

3. No Miranda warning was necessary during the investigative stop of the defendant at Duke Hospital.

4.   The Defendant's statements to Detective Mellown at Duke Hospital were voluntarily made.

5.   The defendant was later placed under arrest.

6.   The Defendant waived his Miranda Rights orally and in written form.

7.   The Defendant's statements made after he waived his right to remain silent were voluntarily given.

8.   Based on the totality of the circumstances, no threat or promises induced the Defendant to make his confession.

9.   None of the [Defendant's] substantive rights were denied by law enforcement during the investigation and arrest of the Defendant.

On 3 August 2011, Defendant entered a negotiated guilty plea to both counts of the indictment before Judge Carl R. Fox, but reserved his right to appeal.  The factual basis of the plea stated that on 10 December 2010 at around 11 a.m., Timothy Nelson, Omari Mitchell, and Gary Brady broke into Charles Dellerman's ("Dellerman") home.  Dellerman, a photographer by profession, was asleep for around five hours prior to his alarm sounding at that time, as he had worked late the night before.  When Dellerman awoke, he heard dogs barking and "a crash and a bang."  Dellerman was confused as to the noise's origin, but then heard "another bang."  Dellerman retrieved his .45 caliber Taurus firearm and

proceeded downstairs to investigate the noises. As he descended, Dellerman "continued to hear rummaging." Dellerman continued to the room where he performed his photographic work and heard someone say "Get him."

Dellerman immediately began "blazing" and discharged several shots. Dellerman later said that there were three individuals in his home, all of whom he hit with his gunshots. Neighbors also reported seeing two individuals limping down the street. The plea also recounted that Defendant was not present at the time Dellerman shot the three intruders, and that he later retrieved Omari Mitchell, who was shot in the abdomen, and brought him to the hospital. Dellerman was not charged, as "he felt like his life was threatened" when the three individuals were within his home. The other three codefendants all pled guilty prior to Defendant's plea.

Defendant was found a Prior Record Level I offender with no prior convictions. On 9 August 2011, the trial court sentenced Defendant to a five to six-month suspended sentence suspended for thirty months of supervised probation. Defendant also was sentenced to fifty hours of community service and required to pay restitution. Defendant was also required to enroll in a graduate

equivalency degree program leading to obtaining his high school diploma.

Defendant filed a timely, but defective written notice of appeal of the order denying suppression on 8 August 2011. *See* N.C. R. App. P. 4(a). This Court dismissed Defendant's appeal on 18 September 2012 for lack of jurisdiction due to the defective notice of appeal. *State v. Thorpe*, COA12-229, 731 S.E.2d 862, 2012 WL 4078409 at *1-2 (N.C. Ct. App. 2012) (unpublished). Specifically, Defendant appealed from the denial of the motion to suppress, but did not appeal the trial court's judgment, which left this Court without jurisdiction to hear the appeal. *Id.* (citing *State v. Miller*, 205 N.C. App. 724, 725, 696 S.E.2d 542, 542 (2010)). Defendant then filed a petition for writ of certiorari, which this Court granted on 15 October 2012.

## II. Jurisdiction & Standard of Review

> Except as provided in subsections (a1) and (a2) of this section and G.S. 15A-979, and except when a motion to withdraw a plea of guilty or no contest has been denied, the defendant is not entitled to appellate review as a matter of right when he has entered a plea of guilty or no contest to a criminal charge in the superior court, but he may petition the appellate division for review by writ of certiorari.

N.C. Gen. Stat. § 15A-1444(e) (2013). However, "[a]n order finally denying a motion to suppress evidence may be reviewed upon an

appeal from a judgment of conviction, including a judgment entered upon a plea of guilty." N.C. Gen. Stat. § 15A-979(b) (2013). As Defendant previously did not appeal the trial court's judgment, a writ of certiorari was required, which Defendant obtained and this Court granted. N.C. R. App. P. 21.

Defendant argues that the trial court erred in denying his motion to suppress based on Fourth and Fifth Amendment violations. In considering a trial court's ruling on a motion to suppress, this Court must consider whether the lower court's findings of fact are supported by competent evidence, though its factual findings are binding where the appellant does not challenge them. *State v. Richmond*, ___ N.C. App. ___, ___, 715 S.E.2d 581, 583 (2011). This Court must then determine whether the trial court's conclusions of law are supported by its findings of fact. *State v. Milien*, 144 N.C. App. 335, 339, 548 S.E.2d 768, 771 (2001). However, "a trial court's conclusions of law as to whether law enforcement had reasonable suspicion or probable cause to detain a defendant are reviewable *de novo*." *State v. Baublitz, Jr.*, 172 N.C. App. 801, 806, 616 S.E.2d 615, 619 (2005).

### III. Analysis

Defendant argues that his statements taken while he was in Officer Mellown's car were taken in violation of the Fourth

Amendment. Defendant also argues that the subsequent statements made at the police station were taken in violation of the Fourth Amendment because they were fruits of impermissible police conduct. We conclude that the trial court failed to make adequate findings to justify its conclusion that defendant was not under arrest, given his nearly two-hour detention. Accordingly, we reverse the order denying defendant's motion to suppress and remand to allow the trial court to make adequate findings on this issue. Therefore, we do not address Defendant's remaining arguments.

### A. Seizure and Arrest of Defendant

Defendant first argues that Detective Mellown seized Defendant and functionally arrested Defendant without a warrant. Defendant argues that such an arrest was illegal, as it required probable cause not present in this case, and any resulting evidence is subject to the exclusionary rule under *Wong Sun v. United States*, 371 U.S. 471 (1963). We agree.

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV. This prohibition applies to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Article I, Section 20 of the North Carolina Constitution similarly prohibits unreasonable searches and

seizures. *State v. Arrington*, 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984). There are generally two types of "seizures" under the Fourth Amendment: "(1) arrests and (2) investigatory stops." *Milien*, 144 N.C. App. at 339, 548 S.E.2d at 771. Arrests require that the arresting officer have "probable cause," whereas investigatory stops do not. *Id.*

Under the standard first laid out in *Terry v. Ohio*, 392 U.S. 1 (1968), officers temporarily detaining someone for investigatory purposes only require "reasonable suspicion of criminal activity." *Florida v. Royer*, 460 U.S. 491, 498 (1983). The detaining officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion, or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The officer's reasonable suspicion

> must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by [the officer's] experience and training.

*State v. Watkin*s, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994). In reviewing the validity of a *Terry* stop, the Court must consider "the totality of the circumstances." *Id.* (*quoting United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Even if a brief detention is justified under *Terry* and its progeny, "[t]he characteristics of the investigatory stop,

including its length, the methods used, and any search performed should be the least intrusive means reasonably available to effectuate the purpose of the stop." *State v. Carrouthers*, ___ N.C. App. ___, ___, 714 S.E.2d 460, 464, *disc. rev. denied* 365 N.C. 361, 718 S.E.2d 392 (2011) (alteration in original, quotation marks and citations omitted). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500. "Where the duration or nature of the intrusion exceeds the permissible scope, a court may determine that the seizure constituted a *de facto* arrest that must be justified by probable cause." *Milien*, 144 N.C. App. at 340, 548 S.E.2d at 772.

In sum, the reasonableness of the methods used in the investigatory stop depends on the circumstances. *Id.* ("The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case." (citation and quotation marks omitted)). During a *Terry* stop, police can use "measures of force such as placing handcuffs on suspects, placing the suspect in the back of police cruisers, drawing weapons, and other forms of force typically used during an arrest." *State v.*

*Campbell*, 188 N.C. App. 701, 709, 656 S.E.2d 721, 727 (2008)(quotation marks and citation omitted).

This Court has held that the use of handcuffs is permissible to "'maintain the status quo.'" *Id.* at 709, 727 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Additionally, in *Carrouthers*, this Court outlined some of the circumstances in which handcuffs might be reasonable, including when "(1) the suspect is uncooperative . . . or (6) the suspects outnumber the officers." *Carrouthers*, ___ N.C. App. at ___, 714 S.E.2d at 465 (quotation marks and citations omitted).

Here, the trial court made three findings of fact relevant to the initial detention of Defendant:

> 2. At or about 11:30 a.m. Investigator Mellown was standing in the area near the entrance to the waiting room when he saw two black males dragging a third black male from a white Dodge Charger. Investigator Mellown observed that the black male being dragged from the car was "limp and appeared to have a diminished level of consciousness."
>
> 3. After emergency room staff took that third person to the patient care area for treatment, Investigator Mellown attempted to detain the other two persons. The other two persons were "both aggressive, belligerent, and noncompliant with orders."
>
> 4. Investigator Mellown was able to determine that the shorter of the two persons had been shot in the arm. A security officer escorted him to the triage nurse for treatment, and the

> other person, subsequently identified as defendant Devine Thorpe, was handcuffed and searched.

As a result of these facts, the trial court concluded that "Investigator Mellown had reasonable suspicion to detain the Defendant and perform an investigative stop."

Here, Officer Mellown's initial use of handcuffs was reasonable under the circumstances. Both Defendant and his companion were acting aggressively. Officer Mellown was dealing initially with two individuals, while being the only police officer present. Officer Mellown then led Defendant, still handcuffed, to his car and placed Defendant in the front passenger seat. When dealing with aggressive, noncooperative individuals, handcuffs and placing the suspect in the officer's car are acceptable methods of effecting an investigatory stop. *See Carrouthers*, ___ N.C. App. at ___, 714 S.E.2d at 464–65. Thus, the stop was not simply a *de facto* arrest as a result of Officer Mellown's initial use of handcuffs or the placement of Defendant in his car.

However, the length of Defendant's detention may have turned the investigative stop into a *de facto* arrest, necessitating probable cause by Officer Mellown for the detention. An investigative stop becomes a *de facto* arrest requiring probable cause when its "duration or nature . . . exceeds the permissible

scope" of a *Terry* stop. *Milien*, 144 N.C. App. at 340, 548 S.E.2d at 772.

One of the key elements of a valid *Terry* stop is brevity. *United States v. Place*, 462 U.S. 696, 709 (1983) ("[T]he brevity of the invasion of the individual's Fourth Amendment interests is an important factor."); *see Milien*, 144 N.C. App. at 340, 548 S.E.2d at 772 ("'[A]n investigative detention *must be temporary* and last no longer than is necessary.'" (emphasis added) (quoting *Royer*, 460 U.S. at 500)).

The Supreme Court of the United States has never approved a *Terry* stop lasting nearly two hours. *Place*, 462 U.S. at 709-10 ("[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here[.]"); *but see Illinois v. McArthur*, 531 U.S. 326, 332 (2001) (holding that preventing defendant from re-entering his home, where probable cause existed showing that drugs were in the defendant's house, was reasonable when the police were waiting for a warrant to search the house). However, the Supreme Court has never adopted an outer limit to the permissible duration of a *Terry* stop. *Place*, 462 U.S. at 709.

To assess whether a seizure under *Terry* is excessive, the court must decide whether the police could have "minimized the intrusion" by more diligently pursuing their investigation through

other means.  *Id.*  According to the United States Supreme Court, a reviewing court should

> examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*United States v. Sharpe*, 470 U.S. 675, 686 (1985).  Thus, it is only when the police *unnecessarily* prolong the seizure that an otherwise valid investigative stop becomes a *de facto* arrest.  *See id.*

In *Place*, the Supreme Court invalidated a seizure which lasted for approximately ninety minutes.  *Place*, 462 U.S. at 709.  In that case, DEA agents seized the defendant's bags as he deplaned in New York's La Guardia Airport and waited for the narcotics dogs to arrive.  *Id.* at 698-99.  The Court reasoned that the since the DEA knew that Place was on his way to New York, they had ample time to prepare the narcotics dogs for Place's arrival, which would have obviated the need to hold him without probable cause for a ninety-minute period.  *Id.* at 709-10.  Therefore, the Court concluded that the government could have pursued their investigation through more expeditious means and the ninety-minute seizure was unconstitutional.  *Id.* at 710.

Here, the trial judge found that the initial conversation between Defendant and Officer Mellown lasted "approximately fifteen minutes" and that Defendant was at the police station by 1:18pm (less than two hours after the first encounter between Officer Mellown and the Defendant). Officer Mellown told Defendant that he was going to be detained until Officer Mellown could "determine what was taking place." It is unclear precisely how long Defendant was held between the end of his conversation with Officer Mellown in the car and his formal arrest at the police station, but it is clear that Defendant was in handcuffs during this entire period, even after he had calmed down.

Additionally, the trial judge made no findings about what Officer Mellown was doing from the time he "escorted" Defendant to the security office to the point at which he was placed under arrest. Therefore, on the record before us we cannot say that the nearly two-hour delay was reasonably necessary for Officer Mellown's investigation. *See id.* (holding a two-hour restraint while waiting for a warrant was reasonable where "the record reveals [that] this time period was no longer than reasonably necessary").

Although length in and of itself will not normally convert an otherwise valid seizure into a *de facto* arrest, where the detention

is more than momentary, as here, there must be some strong justification for the delay to avoid rendering the seizure unreasonable. *See McArthur*, 531 U.S. at 332 (two-hour seizure reasonable when waiting for search warrant); *Place*, 462 U.S. at 709 ("The [90-minute] length of the detention of respondent's luggage *alone* precludes the conclusion that the seizure was reasonable in the absence of probable cause." (emphasis added)); *Royer*, 460 U.S. at 500 ("The scope of the detention must be carefully tailored to its underlying justification."). This detention lasted longer than the normal *Terry* stop. *See, e.g.*, *State v. Sanchez*, 147 N.C. App. 619, 626, 556 S.E.2d 602, 608 (2001), *disc. rev. denied* 355 N.C. 220, 560 S.E.2d 358 (2002) (five-minute detention); *State v. Cornelius*, 104 N.C. App. 583, 590, 410 S.E.2d 504, 509 (1991), *disc. rev. denied* 331 N.C. 119, 414 S.E.2d 762 (1992) (considering a ten-minute investigative stop). Here, without any factual findings addressing the justifications for the extended detention, we cannot properly review whether the trial court erred in concluding that defendant was not under arrest.

The evidence contained in the transcript of the suppression hearing would support a finding that Officer Mellown went almost immediately from speaking with Defendant to interviewing Brady.

During this conversation, Brady admitted to Officer Mellown that "they had gone out to go into a house."  This evidence could support a finding that Officer Mellown was not unnecessarily delaying Defendant's detention.  Thus, the trial judge could justifiably conclude that Officer Mellown was diligently pursuing his investigation. *See Cornelius*, 104 N.C. App. at 590, 410 S.E.2d at 509 (ten-minute delay permissible where "the officers acted diligently in their investigation").  If the trial judge does so find, a conclusion that the detention was not unnecessarily prolonged might also be justified. Therefore, we remand the case for findings on whether the extended detention was justified, and if it was not, whether and when Officer Mellown developed probable cause to arrest Defendant.  As a result, we do not address the remainder of Defendant's arguments.

## IV. Conclusion

For the reasons stated above, the trial court's denial of Defendant's motion to suppress is

REVERSED AND REMANDED IN PART FOR FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW.

Judges STROUD and DILLON concur.